# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-30139

United States Court of Appeals
Fifth Circuit

**FILED**

April 10, 2019

Lyle W. Cayce
Clerk

WASTE MANAGEMENT OF LOUISIANA, L.L.C.,

      Plaintiff–Appellant

v.

RIVER BIRCH, INCORPORATED; ALBERT J. WARD, JR.; FREDERICK R. HEEBE; HIGHWAY 90, L.L.C.,

      Defendants–Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before DAVIS, COSTA, and OLDHAM, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This appeal challenges the district court's order granting partial summary judgment in favor of Defendants River Birch, Inc., Albert Ward, Frederick Heebe and Highway 90, L.L.C (hereinafter sometimes collectively referred as "River Birch"). Plaintiff Waste Management alleged that Defendants bribed former New Orleans Mayor Ray Nagin to shut down a landfill opened in the city in the aftermath of Hurricane Katrina. Plaintiff was the operator of the shuttered landfill, and Defendants owned and operated competing landfills. Plaintiff alleged that the closure of its Chef Menteur landfill caused it to lose business that accrued to the benefit of its competitor,

No. 18-30139

the River Birch landfill.  On summary judgment, the district court concluded that the Rule 56 evidence presented no jury question regarding the essential causation element to Plaintiff's civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d).  Specifically, the district court, without considering whether Defendants' $20,000 campaign contribution was a bribe, held that the summary judgment evidence failed to create a genuine issue of material fact to allow a jury to find that this payment was the but for and proximate cause of Nagin's decision to shut down Plaintiff's landfill at Chef Menteur Highway.

Upon careful review of the summary judgment record, however, we disagree.  We are persuaded that the evidence, which is primarily circumstantial in nature, is sufficient for a jury to make positive findings on both Plaintiff's claim that the $20,000 payment to Nagin was a bribe and that the bribe was causally related to Nagin's action in shuttering the Chef Menteur landfill.  We therefore vacate the district court's judgment and remand this case for further proceedings.

## I. BACKGROUND

In August 2005, after the passage of Hurricane Katrina, which devastated large portions of New Orleans, there was an urgent need for additional landfill capacity in which to deposit the extensive waste.  Given the scope of the damage, Mayor Ray Nagin[1] declared a state of emergency on

---

[1] Nagin was the Mayor of the City of New Orleans from May 2002 to May 2010.  In 2013, a federal grand jury returned a 21-count indictment against Nagin, charging him with one count of conspiracy to commit honest-services wire fraud and bribery; six counts of bribery; nine counts of honest-services wire fraud; one count of conspiracy to commit money laundering; and four counts of filing false tax returns.  After trial, the jury returned guilty verdicts on all counts of the indictment, except for one count of bribery.  The district court sentenced Nagin to ten years in prison.  *See United States v. Nagin*, 810 F.3d 348 (5th Cir. 2016).

No. 18-30139

August 31, 2005 and renewed that emergency declaration fifteen times. The final renewal was issued on November 3, 2006, and it expired thirty days later.

In November 2005, Waste Management submitted a proposal to open a landfill on Chef Menteur Highway in New Orleans East. Although authorization for such a landfill would ordinarily require a conditional use permit from the New Orleans City Council, Mayor Nagin believed that the city had an immediate need for additional landfill capacity. On February 9, 2006, Nagin, pursuant to his emergency declaration, issued Executive Order CRN 06-03 to suspend provisions of the comprehensive zoning ordinance for six months to authorize the construction and operation of a landfill at the Chef Menteur location. The City of New Orleans then entered into a written agreement with Waste Management to open the landfill; this agreement, however, did not mention an end date. On February 14, 2006, Nagin submitted an emergency disaster cleanup site request for approval to the Louisiana Department of Environmental Quality ("LDEQ") to open the landfill at Chef Menteur for "the duration of the Hurricane Katrina disaster cleanup efforts, at this time estimated to be 12 months." It is uncontested that Nagin had authority to extend the six-month suspension of the zoning ordinance at least until his emergency powers expired on December 3, 2006.

Mayor Nagin's order authorizing the landfill was not well-received by residents of New Orleans East or by the City Council. On April 6, 2006, the City Council passed a resolution condemning Nagin's February 9 executive order based on community opposition to the Chef Menteur landfill.

Around this time, Mayor Nagin was engaged in a hotly contested campaign for re-election. A runoff was scheduled for May 20, 2006. Two weeks before the runoff election, Mayor Nagin called Defendant Ward and asked for a campaign contribution. Ward discussed this request with Heebe, and they decided to make a $20,000 contribution through four shell corporations

No. 18-30139

established by Defendants—each donating $5,000.[2]   The contribution was made on May 16, 2006.  According to Nagin, however, he did not remember the conversation with Ward and was not aware of the contribution.  Nagin was subsequently re-elected mayor.

On July 13, 2006, Nagin announced in a court affidavit—in a lawsuit secretly financed by Defendants—that he would not extend his February 9 executive order authorizing the Chef Menteur landfill and would allow it to expire on August 14, 2006.  On August 14, the City sent a cease and desist letter to Waste Management, ordering the closure of the landfill.

## II.  PROCEDURAL HISTORY

Waste Management filed the instant RICO action in September 2011.  In its first amended complaint, Plaintiff alleged that Defendants bribed Henry Mouton,[3] a former commissioner for the Louisiana Department of Wildlife and Fisheries, to influence Nagin to shut down the Chef Menteur landfill.  The district court dismissed the claims without prejudice because the amended complaint did not allege how Mouton's conduct was the but for and proximate cause of Nagin's decision.

Waste Management next filed a second amended complaint, alleging that (1) Mouton's lobbying and (2) Defendants' campaign contribution to Nagin led to the landfill's closure.  On March 27, 2015, the district court dismissed the action insofar as the alleged bribery of Mouton was concerned.  But the

---

[2] Under Louisiana election law, donating to campaigns "through or in the name of another, directly or indirectly" is illegal. LA. R.S. § 18:1505.2(a)(1).  Moreover, the campaign contribution limit per individual in this election was $5,000. *See id.* § 18:1505.2.

[3] On February 25, 2011, Mouton was charged with one count of conspiracy to receive illegal payoffs by an agent of a program receiving federal funds, in violation of 18 U.S.C. § 371; three counts of receipt of illegal payoffs by an agent of a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B); and four counts of making false statements to federal agents, in violation of 18 U.S.C. § 1001(a)(2).  On June 1, 2011, Mouton pled guilty to conspiracy to receive illegal payoffs, pursuant to a plea agreement with the Government. *See United States v. Mouton*, No. 11-CR-48, 2013 WL 2455934, at \*1–2 (E.D. La. June 5, 2013).

court did not dismiss the claims based on allegations concerning the $20,000 campaign contribution to Nagin.

In its third amended complaint, Waste Management included all of the factual allegations regarding the Defendants' conduct with respect to both Mouton and Nagin. Defendants filed another motion to dismiss and a motion to strike the allegation relating to Mouton's role in the scheme to shut down the landfill. The district court denied their motions. Over a year of discovery then followed, including depositions of Mouton and Nagin.

After discovery, Defendants moved for partial summary judgment, arguing that Plaintiff failed to establish that the campaign contribution to Nagin constituted bribery. Defendants further argued that, even if it was bribery, it was not the but for and proximate cause of Nagin's decision to close down the Chef Menteur landfill. The district court agreed and dismissed Plaintiff's RICO claims, stating that "the circumstantial evidence on which Waste Management relies is far too speculative and conclusory to permit a reasonable trier of fact to find the requisite causal connection." We now consider the issues presented in this appeal below.

## III. RULE 12(B)(6) DISMISSAL AS RELATED TO HENRY MOUTON

### A.    Standard of Review

Before examining the summary judgment evidence, we briefly address Waste Management's appeal of the district court's March 27, 2015 order granting Defendants' Rule 12(b)(6) motion, which dismissed Plaintiff's suit "insofar as those claims are predicated on Defendants' alleged bribery of Mouton." We review the district court's grant of a motion to dismiss de novo.[4] Dismissal is appropriate when the plaintiff has failed to allege "enough facts to state a claim to relief that is plausible on its face."[5]

---

[4] *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010).

[5] *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

No. 18-30139

## B.    Analysis

Here, Plaintiff's second amended complaint alleges that Mouton—who pled guilty to accepting bribes from Defendants for attempting to close down other landfills—was also bribed by Defendants to assist in persuading Nagin to shutter the Chef Menteur landfill.  According to Plaintiff, this scheme was "part of a well-orchestrated campaign to unlawfully and unfairly influence the approval, permitting, and operations of the River Birch Defendants' landfill competitors."    Based on the pleadings, we find that the second amended complaint alleged a plausible claim of Mouton's involvement in the instant case.  The allegations, if true, warrant relief under RICO.[6]  We therefore vacate the district court's Rule 12(b)(6) ruling insofar as it precludes consideration of Defendants' alleged bribery of Mouton and his efforts to further Defendants' alleged scheme to shutter the Chef Menteur landfill.

## IV.  SUMMARY JUDGMENT

On appeal, Defendants argue that Plaintiff failed to put forth competent evidence that their $20,000 campaign contribution to Nagin's re-election campaign was a bribe under Louisiana law, and even if it was a bribe, it did not cause Nagin to shutter the Chef Menteur landfill.

## A.    Standard of Review

We consider the district court's grant of Defendants' motion for summary judgment dismissing Plaintiff's RICO claims against Defendants.  We review this de novo,[7] and we apply the same criteria employed by the district court.[8]  "Summary judgment is proper only when it appears that there is no genuine issue of material fact and that the moving party is entitled to judgment as a

---

[6] Our discussion below fleshes out in more detail how Mouton's involvement is important to the determination of Defendants' liability under RICO.

[7] *See Whitley v. BP. P.L.C.*, 838 F.3d 523, 526 (5th Cir. 2016); *Burnett Ranches, Ltd. v. United States*, 753 F.3d 143, 146 (5th Cir. 2014).

[8] *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

matter of law."[9]  "On summary judgment the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion."[10] "Credibility determinations have no place in summary judgment proceedings" because "non-movants' summary judgment evidence must be taken as true."[11] Moreover, "[w]hen state of mind is an essential element of the nonmoving party's claim, it is less fashionable to grant summary judgment because a party's state of mind is inherently a question of fact which turns on credibility."[12]

## B.    Analysis

We turn first to Plaintiff's argument that the $20,000 contribution by Defendants to Nagin was a bribe and a "predicate act" under RICO.  An act of "racketeering activity," commonly referred as a "predicate act,"[13] includes "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than a year."[14]

We look to Louisiana law for the definition of a bribe.  Louisiana's public bribery statute, Revised Statute § 14:118, defines public bribery as "the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any [public official], with the intent to influence his conduct in relation to his position, employment, or duty."[15]  Louisiana courts interpreting this statute have found that the defendant must have "specific

---

[9] *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997) (citing FED. R. CIV. P. 56).

[10] *Id.* (citation omitted).

[11] *Koerner v. CMR Constr. & Roofing, L.L.C.*, 910 F.3d 221, 227 (5th Cir. 2018) (quoting *Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir. 1994)).

[12] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991).

[13] *See Dev. Corp. v. Benison*, No. 7:15-CV-02160-LSC, 2018 WL 5537766, at *5 (N.D. Ala. Oct. 29, 2018) (citation omitted); *Sebago, Inc. v. Beazer E., Inc.*, 18 F. Supp. 2d 70, 79 (D. Mass. 1998) (citation omitted).

[14] 18 U.S.C. § 1961(1).

[15] LA. R.S. § 14:118 (A)(1).

intent" to commit the crime of bribery.[16]  "The inquiry under the Louisiana statute, then, is whether the gift is made . . . with the intent to influence the conduct of the public servant in relation to his position, employment, or duty."[17] Specific intent to bribe may be determined from all the facts and circumstances surrounding the case.[18]

RICO creates a private civil action to be brought by "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter . . . ."[19] Section 1962, which contains RICO's criminal provision, makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[20]  Conspiracy to violate section 1962 is also unlawful.[21]  And relevant here, bribery is a predicate offense and enumerated as a "racketeering activity" under 18 U.S.C. § 1961(1).

"The Supreme Court requires plaintiffs to establish both but for cause and proximate cause in order to show injury 'by reason of' a RICO violation."[22] "Proximate cause should be evaluated in light of its common-law foundations [and] . . . requires 'some direct relation between the injury asserted and the

---

[16] *See State v. Hingle*, 677 So. 2d 603, 607 (La. Ct. App. 2d Cir. 1996) ("Specific intent is a state of mind and need not be proved as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. Specific intent exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act.") (citations omitted); *State v. Kyzar*, 509 So. 2d 147, 151 (La. Ct. App. 1st Cir. 1987) ("All that the [public bribery] statute requires is the 'intent to influence,'" and "[t]he action induced need not be corrupt or illegal.") (citing *State v. Ponthier*, 391 So. 2d 1138, 1139 (La. 1980)).

[17] *United States v. L'Hoste*, 609 F.2d 796, 807 (5th Cir. 1980) (applying Louisiana law); *see also State v. Smith*, 212 So. 2d 410, 412 (La. 1968).

[18] *See L'Hoste*, 609 F.2d at 808.

[19] 18 U.S.C. § 1964(c).

[20] *Id.* § 1962(c).

[21] *Id.* § 1962(d).

[22] *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016) (en banc) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008)).

injurious conduct alleged.'"[23] "When a court evaluates a RICO claim for proximate cause, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."[24] Therefore, to satisfy the causation element of RICO in this case, Plaintiff has the burden of establishing that the payment to Nagin was the but for cause and proximate cause of his decision to shutter the landfill.[25] This burden requires Plaintiff to establish that its damages "w[ere] a foreseeable and natural consequence" of Defendants' action.[26]

Under this causation standard, the resolution of this appeal requires us to examine, in detail, the summary judgment evidence to determine whether that evidence, along with the inferences that a jury could draw from that evidence, would create a fact question on these issues. A plaintiff need not rely on direct evidence; causation can be proven with circumstantial evidence.[27]

1.    *The Evidence Relied Upon by Defendants in Support of Summary Judgment.*

River Birch argues first that no evidence supports Waste Management's theory that the $20,000 campaign contribution it made through related shell corporations was intended as a bribe—that is, to intentionally influence Mayor Nagin to shut down the Chef Menteur landfill. River Birch points to the lack of evidence of a *quid pro quo* agreement between Defendants and Mayor Nagin or indeed that Defendants asked Nagin to do anything for them.

Moreover, Defendants emphasize that it is neither illegal nor unusual for them to make a campaign contribution because they rely on the goodwill of

---

[23] *Id.* (citing *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)).

[24] *Id.* (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).

[25] *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

[26] *Bridge*, 553 U.S. at 657.

[27] *See United States v. Jones*, 873 F.3d 482, 490 (5th Cir. 2017) (permitting jury to find RICO enterprise by circumstantial evidence); *United States v. Griffin*, 324 F.3d 330, 357–58 (5th Cir. 2003).

political entities in large part for their business. They also assert that they must make campaign contributions to level the playing field and to give them access to political decision-makers. Defendants also point out that no evidence was produced of any conversation or other communication between them and Nagin around the time of the alleged bribe.

> 2. *The Evidence Relied Upon by Plaintiff in Opposition to Summary Judgment.*

Waste Management argues that a jury could reasonably conclude from circumstantial evidence that the $20,000 contribution by River Birch's shell corporations to Nagin was a bribe. Plaintiff bases its argument on the circumstances surrounding Defendants' alleged bribery of Mouton and other circumstances around the payment to Nagin. Moreover, Plaintiff points out that the district court failed to address evidence on Mouton in its summary judgment opinion.

> a. *Henry Mouton*

Mouton was a former commissioner for the Louisiana Department of Wildlife and Fisheries. Waste Management argues that Mouton played a large role in Defendants' underlying scheme to shutter the Chef Menteur landfill. In 2011, Mouton pled guilty to violating 18 U.S.C. § 371, admitting that he received bribes for using his official position to assist Defendants by influencing public officials to help Defendants shutter landfill competitors. Relevant here, Mouton's factual basis supporting his guilty plea provides:

> Shortly after Hurricane Katrina made landfall in August of 2005, Co-conspirator "A" and other Co-conspirators recognized the potential to obtain millions of dollars in revenue for the collection and disposal of storm debris from storm ravaged areas. . . . Co-conspirator "A" conspired with Mouton to shutter the competition. The plan was to eliminate the competition and increase the revenue of Co-conspirator "A" by increasing the amount of storm debris deposited in the landfills owned by Co-conspirator "A."

No. 18-30139

Mouton confirmed at his deposition in this case that Co-conspirator "A" was Defendant Heebe and that the Chef Menteur landfill was one of the landfills that was targeted as part of the scheme he had with Heebe. Moreover, as part of the campaign of Defendants to shutter the Chef Menteur landfill, Mouton testified that Heebe and Ward, or their attorneys, wrote or assisted in drafting a letter for Mouton to send to the Louisiana Department of Environmental Quality, as well as federal agencies, urging the closure of the Chef Menteur landfill for alleged environmental reasons.[28]   Mouton, presumably for the benefit of Defendants, also sent copies of the letter to the City of New Orleans.

Under Rule 56, we construe Waste Management's summary judgment evidence as true;[29] this includes statements made in Mouton's factual basis and deposition. Defendants and Mouton knew that Nagin was the critical decision-maker who had authority to either extend or decline to extend the temporary order allowing the Chef Menteur landfill to continue operations. A jury could therefore conclude that Mouton's communication of allegedly false environmental concerns about the landfill to state and federal agencies was designed to have these government agencies influence Nagin to shut down the landfill. Because Mouton's action in this respect could be seen as part of the overall plan to shutter the Chef Menteur landfill, evidence of Defendants' conduct in bribing Mouton to participate is intrinsic to this case.

---

[28] On April 6, 2006, Mouton sent this letter and notice of intention to file a citizen's suit regarding the Chef Menteur landfill, alleging violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* This letter was addressed to the Administrator of the Environmental Protection Agency and forwarded to, among others, the Regional Administrator of the EPA, the U.S. Attorney General, the Louisiana Attorney General, Secretary of LDEQ, U.S. Attorney for the Eastern District of Louisiana, and Criminal Division of the Internal Revenue Service.

[29] *Koerner*, 910 F.3d at 227.

11

No. 18-30139

In *United States v. Rice*, we explained that evidence that is intrinsic to the case is not limited by Federal Rule of Evidence 404(b),[30] such that "other act" evidence may be used to show that the actor acted similarly in the case before the court.[31] We stated that "'other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged."[32] Moreover, "[i]ntrinsic evidence is admissible to 'complete the story of the crime by proving the immediate context of events in time and place,' and to 'evaluate all of the circumstances under which the defendant acted.'"[33] We explained that "[i]ntrinsic evidence does not implicate [R]ule 404(b), and 'consideration of its admissibility pursuant to [that rule] is unnecessary.'"[34]

Although *Rice* is a criminal case, the same rationale applies in the civil context.[35] This is particularly true here, where the elements in the criminal-RICO context overlap with the elements of a civil-RICO case.[36] So, in this case, based on Mouton's testimony that there was a scheme to shutter the Chef Menteur landfill, the evidence suggesting Defendants' intent to bribe Mouton

---

[30] Federal Rule of Evidence 404(b)(1) provides: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

[31] 607 F.3d 133, 141 (5th Cir. 2010).

[32] *Id.* (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)).

[33] *Id.* (citations omitted).

[34] *Id.* (quoting *United States v. Garcia*, 27 F.3d 1009, 1014 (5th Cir. 1994)) (bracket original); *see also United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005) (holding "[i]ntrinsic evidence is generally admissible" and its "admission is not subject to [R]ule 404(b).").

[35] *See, e.g.*, *Elliot v. Turner Const. Co.*, 381 F.3d 995, 1004 (10th Cir. 2004) (holding evidence intrinsic to plaintiff's negligence claim admissible because it was "part of the same tortious event" and essential to illustrate events leading up to plaintiff's injuries).

[36] *See St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 446 n.15 (5th Cir. 2000). Civil-RICO liability arises under RICO. 18 U.S.C. § 1964(c); *see also Anza*, 547 U.S. at 453 ("One of RICO's enforcement mechanisms is a private right of action. . . .").

12

can be considered by the jury in determining Defendants' motive and intent in connection with their contribution to Nagin's campaign.[37]

Waste Management also points to the additional fact that these contributions in the amount of $5,000 each were made not in Defendants' names, but rather by four shell corporations owned by Defendants. The parties do not dispute that River Birch, Heebe and Ward funded these contributions. And these contributions, in fact, violated Louisiana law, which prohibits a party from making political contributions in the names of others.[38]   Plaintiff argues that Defendants' attempt to conceal the true source of the contributions raises an inference that their contributions were intended to cover up evidence of wrongdoing. Moreover, one of the shell corporations that made a $5,000 campaign donation to Nagin—Westside Construction Services—was the same entity Heebe used to pay Mouton.

Mouton also assisted Defendants in other ways to achieve the scheme's objective. On April 6, 2006, at Defendants' request, Mouton threatened the City with a lawsuit seeking an injunction to close the Chef Menteur landfill for environmental reasons. Mouton did not follow through with this threat, but Defendants recruited certain plaintiffs who resided in the area of the landfill and, again using the shell corporation Westside Construction Services, financed a lawsuit against the City seeking closure of the landfill. All along, Defendants remained in the background and concealed their role in the litigation.

Moreover, Waste Management points out that Mayor Nagin was convicted of public bribery in a totally different scheme in 2013,[39] which would

---

[37] To be clear, we do not intend to preempt the district court's right to rule on any evidentiary objection that this evidence is not intrinsic. The district court must rule on the objection, if raised, based on the evidence at trial.

[38] *See* LA. R.S. § 18:1505.2(a)(1).

[39] See *supra* note 1 for description of Nagin's criminal conviction.

serve as strong impeachment material to undermine all of Nagin's testimony, including his denial that he was paid by Defendants to close the landfill.

Plaintiff also points to the timing of Defendants' $20,000 payment to Nagin, on the eve of the expiration of the emergency order, as support for Plaintiff's position that the payment was to influence Nagin to close the landfill. Plaintiff considers it relevant that when Heebe and Ward became concerned that Nagin may not have been fully aware of their $20,000 contribution, Ward sent a letter, delivered to Nagin's campaign by Ward's chauffeur, just three days before the expiration of the emergency order reminding Nagin of the campaign payment and Defendants' earlier support of him.

It is rare in public bribery cases that there is definitive "smoking gun" evidence to show a payment was made to an official to influence the official to perform some act—and there is no such evidence here.[40] It is critical in cases such as this that inferences from circumstantial evidence about intent and motives about which reasonable minds could differ be sorted out by the jury.[41]

### b.    Causation

Defendants argue next that even if the question of whether their $20,000 payment was a bribe must go to the jury, they are still entitled to summary judgment because there is no evidence that the payment proximately caused Mayor Nagin to close the landfill. Defendants' principal argument—that the evidence does not support any causal connection between Defendants' $20,000

---

[40] *See United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978) ("Like a criminal conspiracy, a RICO enterprise cannot be expected to maintain a high profile in the community. Its affairs are likely to be conducted in secrecy and to involve a minimal amount of necessary contact between participants.").

[41] *See United States v. Garza*, 574 F.2d 298, 304–05 (5th Cir. 1978) ("[I]t is the jury's duty to draw whatever permissible inferences it may from circumstantial evidence that usually forms the basis for finding criminal intent, and to find a verdict founded on whatever permissible inferences the jury chooses to draw.") (citation omitted); *Crowe v. Henry*, 115 F.3d 294, 298 (5th Cir. 1997).

payment and Nagin's ultimate decision to shut down the Chef Menteur landfill—rests on the executive order itself and Nagin's deposition testimony. The executive order authorized the Chef Menteur landfill to operate for six months from the date it was signed on February 9, 2006. Nagin testified that when he signed the executive order, he never intended to extend it or to allow the landfill to remain open after that date.

But a jury could reasonably find otherwise. As indicated above, Mayor Nagin's felony conviction for public bribery in a different scheme provides abundant fodder for impeaching his testimony. It is also obvious that Nagin had an interest in avoiding further criminal or civil jeopardy for participating in another bribery scheme. Moreover, a jury could infer that Nagin's acceptance of bribes, while holding public office, was a part of his "pattern of conduct" or "modus operandi."

There was also other evidence tending to undermine Mayor Nagin's testimony that he never intended to authorize the landfill to operate past August 2006, when the emergency order was set to expire. This is reflected by the request signed by Nagin, which was submitted to LDEQ (five days after Nagin signed the emergency order) seeking approval of the City's plan to open the Chef Menteur landfill "for the duration of the Katrina cleanup."

Also, Mayor Nagin, in an apparent effort to quash environmental concerns of his constituents who lived in the area of the landfill, announced on June 30, 2006, the favorable results of environmental testing. Nagin then announced two weeks later, on July 13, 2006, his decision to shutter the landfill. This tends to support Waste Management's argument that Nagin suddenly reversed his position about extending authorization to leave the landfill open. In other words, a jury could question why Nagin made the positive announcement on June 30, 2006, unless he planned to allow the landfill to remain open.

No. 18-30139

In addition to Waste Management's surprise about the closing of the landfill in August, federal and state officials also testified that they were taken aback at the abrupt closure of the landfill. In particular, Dr. Chuck Carr Brown, who oversaw the Katrina debris cleanup at LDEQ, testified by deposition that he understood the City had planned to keep the Chef Menteur landfill open as long as LDEQ needed it for the disaster cleanup. Dr. Brown was surprised and confused when he learned of the Mayor's decision not to extend the authorization of the Chef Menteur landfill, particularly given the Mayor's recent announcement of the environmental testing of the landfill. Dr. Brown immediately sought a clarification from the City as to why it had changed its position, and he sought to explain the dire need for the landfill and the adverse consequences from its closing. The apparent sudden reversal of Nagin's position on whether to close the landfill, which was contrary to the understanding held by the environmental agencies, supports the inference that Mayor Nagin's original intention was for the Chef Menteur landfill to operate for the duration of the Katrina cleanup.

Even though Defendants argue that the City Council had exclusive regulatory authority over zoning, Nagin could have renewed his executive order while his general emergency declaration was in effect,[42] which would have allowed the Chef Menteur landfill to continue operations without a conditional use permit.

In summary, Mayor Nagin in February 2006 signed the executive order, the agreement with Waste Management, and the LDEQ form seeking approval to open and maintain the Chef Menteur landfill until the Katrina cleanup was complete. Nagin was re-elected on May 20, 2006, with the Chef Menteur landfill operating and no indication that he would no longer support it. After

---

[42] *See* LA. R.S. § 29:721 *et seq.*

16

extensive environmental testing with LDEQ confirmed that there were no environmental hazards at the Chef Menteur landfill, on June 30, 2006, Nagin publicly announced those results, stating the test results "should ease the concerns of the citizens." Then, on July 10, 2006, Ward wrote to remind Nagin's associates of Defendants' large financial contributions ($20,000 in 2006 and $40,000 in 2005) that Defendants had made "on a direct basis with Mayor Nagin." Only three days later, by affidavit filed in a litigation secretly financed by Defendant River Birch, Nagin announced that he would not renew the executive order. This chain of events, if accepted by the jury, supports the inference that Defendants' bribery of Mayor Nagin influenced his actions in refusing to extend the executive order. A reasonable jury could also infer causation from Mayor Nagin's disregard of the evidence that the Chef Menteur landfill was safe and badly needed in the City's disaster cleanup. Accordingly, we hold that Plaintiff has provided sufficient evidence to survive a summary judgment challenge in this case.

*      *      *

The dissent is correct that this case is a close call. Evidence here—along with the reasonable inferences drawn from this evidence—could reasonably show either political pressure or pay-to-play bribes that motivated Nagin to shutter the Chef Menteur landfill. But the dissent is wrong to suggest that *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*[43] alters the summary judgment standard in this RICO case to preclude the jury from evaluating this evidence and deciding what inferences to draw from the evidence it accepts.

We begin with a recap. *Matsushita* was an antitrust case that challenged Japanese television manufacturers' lowering of prices as anti-competitive.[44] The Supreme Court held that "a plaintiff seeking damages for a violation of § 1

---

[43] 475 U.S. 574 (1986).

[44] *Id.* at 577–78.

[of the Sherman Act] must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently."[45]  The Court found that the plaintiffs' substantive claim of conspiracy to engage in predatory pricing made no economic sense because such a scheme was risky and self-deterring as it was too costly to the conspirators.[46]  The Court held that the general summary judgment rule applied: "[I]nferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the [summary judgment] motion."[47]  And the Court recognized that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case."[48]  So considered altogether, in this antitrust context, the Court concluded that if a plaintiff relies on circumstantial evidence of an agreement rather than express acts, and if the claim against a defendant appears implausible, a plaintiff has an additional evidentiary burden to survive a summary judgment attack:

> [T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56(e).  Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.[49]

Put differently, if it appears that a defendant lacks a plausible motive for engaging in anticompetitive conduct, in order to survive summary judgment, an antitrust plaintiff must present evidence that "show[s] that the

---

[45] *Id.* at 588.
[46] *Id.* at 594–95.
[47] *Id.* at 587–88 (citation omitted).
[48] *Id.* at 588.
[49] *Id.* at 596–97.

No. 18-30139

inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiffs]."[50] *Matsushita* confines courts from drawing inferences in antitrust cases that are at odds with economic theory (specifically, predatory pricing).[51]

The *Matsushita* Court's antitrust lesson on summary judgment is not applicable here.[52] The dissent falls into error by extending it to our civil-RICO

---

[50] *Id*. at 588.

[51] *Matsushita* built upon *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984) by holding that "antitrust law limits the range of permissible inferences from ambiguous evidence." *Matsushita*, 475 U.S. at 588. "The Court's rationale for awarding summary judgment to the defendants in *Matsushita*, then, turned to a large extent on its rejection of a substantive theory of antitrust law—implausible theories of predatory pricing were now disfavored as a matter of substantive law." EDWARD J. BRUNET ET AL., SUMMARY JUDGMENT: FEDERAL LAW AND PRACTICE § 9.5, at p. 423 (2019).

[52] The summary judgment standard, as applied in *Matsushita*, was predicated on substantive antitrust law. As Professor Brunet states:

> Standing on its own, however, apart from the [1986 summary-judgment] trilogy, *Matsushita* functions best as a model for antitrust summary judgment. The Court's discussion on the summary judgment process repeatedly refers to substantive antitrust doctrine. For example, the Court's statement that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 [Sherman Act] case" was a response to the plaintiffs' contention that all inferences "must be viewed in the light most favorable to the party opposing the [summary judgment] motion." Moreover, the Supreme Court framed the burden placed on the nonmovant in a specific antitrust factual context.

*Id.* at 425 (citations omitted).

Other scholars share a similar characterization of the *Matsushita* opinion. *See, e.g.*, JAMES WM. MOORE ET AL., 11 MOORE'S FEDERAL PRACTICE § 56.22[2][c] (3d ed. 2018). Specifically, they recognize:

> The [Supreme] Court found the plaintiff's theory of a long-running predatory pricing scheme implausible because it would require defendants to incur substantial losses jointly for years without an intervening opportunity to recoup monopoly profits.

> The Supreme Court then incorporated the substantive evidentiary standard applicable in antitrust cases into its

19

case. Using circumstantial evidence to conclude that a bribe occurred is not at odds with economic theory. Both Nagin and River Birch allegedly sought monetary gains; Waste Management's argument does not defy settled economic principles.[53]

The dissent, without citation, insists that "[i]n RICO conspiracies, like antitrust ones, the plaintiff has an affirmative obligation to negate other innocent explanations for the defendants' conduct." The dissent goes further: "To carry [plaintiff's] burden, Waste Management must produce evidence that 'tends to exclude the possibility' Mayor Nagin was motivated by politics rather than bribes." We have not imposed such a heightened burden on a RICO plaintiff.[54] Rather, we have maintained, and our precedent holds, that a RICO plaintiff:

> analysis, noting that "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 [of the Sherman Act] case." Under substantive antitrust law, conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. Therefore, to survive a motion for summary judgment, the plaintiffs had to present evidence that tended to exclude the possibility that the alleged conspirators acted independently.

*Id.* (citations omitted); *see* Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L. REV. 982, 1044–68 (2003) (concluding that *Matsushita* "seems specific to the antitrust context").

[53] It is telling that River Birch has never thought the instant case has anything to do with *Matsushita* and that case's point about economic rationality. Defendants never raised it. Nagin's and Mouton's history of receiving bribes shows there is nothing economically irrational about that conduct.

[54] The dissent cites a number of cases, *see post*, at 31 (opinion of OLDHAM, J.), that "apply *Matsushita* in non-antitrust cases." That's not surprising, considering that *Matsushita* is one of the most-cited Supreme Court cases. But in non-antitrust context, courts apply *Matsushita* for its statement of the general Rule 56 standard: "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87 (citations omitted). The cases cited by the dissent show precisely that.

does not need to disprove [a defendant's] explanation of the situation in order to survive summary judgment. [A RICO plaintiff] need only present evidence that would permit a reasonable finder of fact to accept his interpretation of the facts. . . . The decision as to whether to believe [plaintiff's or defendant's] explanation of the facts requires the type of credibility determination by the court that is plainly inappropriate on motion for summary judgment.[55]

We have been reminded by the Supreme Court since *Matsushita* that, on summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."[56] In *Tolan v. Cotton*, though recognizing that it "is not equipped to correct every perceived error coming from the lower federal courts," the Supreme Court "intervene[d]" to summarily reverse our Rule 56 dismissal, calling it "a clear misapprehension of summary judgment standards. . . ."[57] We need not repeat this rebuke.

This close case—where the evidence could support a verdict for either side, depending upon the evidence the jury credits and the reasonable inferences drawn from that evidence—is tailor-made for a trial, not summary judgment. A question that "turns on state of mind," that is, Nagin's reasoning

---

The dissent argues that Waste Management, in response to a summary judgment motion, has an affirmative duty to negate River Birch's argument that Nagin shuttered the landfill due to political pressure. In taking this position, the dissent refuses to accept the reading of *Matsushita* by courts, scholars and civil procedure treatise authors who recognize that this part of the *Matsushita* holding was governed by substantive antitrust law that required the plaintiff to show a plausible economic motive for plaintiff's predatory acts to prevail in that § 1 antitrust case. Application of the dissent's rule, based on an extended reading of *Matsushita*, on RICO and other civil cases would turn summary judgment on its head.

[55] *See Crowe v. Henry*, 115 F.3d 294, 298 (5th Cir. 1997); *see also, e.g.*, *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228 (5th Cir. 2003) (applying general Rule 56 summary judgment standard in RICO case).

[56] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam) (summarily reversing our entry of summary judgment emphasizing "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *see also, e.g.*, *Thomas v. Nugent*, 572 U.S. 1111 (2014) (remanding case in light of *Tolan*).

[57] *Tolan,* 572 U.S. at 659.

for shuttering the Chef Menteur landfill and River Birch's decision to discreetly transfer and donate funds to Nagin through shell corporations, is "often inappropriate for resolution at the summary judgment stage."[58]  We hold that the correct disposition of this civil-RICO appeal is to remand it for trial so that a jury can sort out the facts and decide what appropriate inferences should be drawn from those facts.[59]

## V.  CONCLUSION

For the above reasons, we are satisfied that the record reflects genuine issues of material fact as to both whether the Defendants' campaign contribution to Nagin was a bribe and whether the payment was the but for and proximate cause of Nagin's decision to close the Chef Menteur landfill.  We therefore VACATE the district court's judgment and REMAND for further proceedings consistent with this opinion.  We also VACATE the district court's March 27, 2015 order of dismissal insofar as that order bars consideration of evidence related to Mouton.

**VACATED AND REMANDED.**

---

[58] *See Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993); *Int'l Shortstop*, 939 F.2d at 1265.

[59] To the extent the dissent is concerned about chilling First Amendment rights, our decision today does no such thing.  We recognize that Supreme Court precedent safeguards political speech.  *See Citizens United v. FEC*, 558 U.S. 310, 339–40 (2010).  But such protection, afforded by the First Amendment, does not extend to certain illegal activities. *See, e.g.*, *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014) (noting First Amendment does not protect *quid pro quo* corruption).  Under Louisiana law, political donations, like the ones by Defendants, cannot be made in disguise and veiled by shell corporations to bypass campaign-contribution limits.  The First Amendment is therefore not implicated here.  Indeed, the dissent's point about the First Amendment is again one River Birch did not think worth making.  And rightly so.

No. 18-30139

ANDREW S. OLDHAM, Circuit Judge, dissenting:

"[Bad] facts make bad law." *Wyeth v. Levine*, 555 U.S. 555, 604 (2009) (Alito, J., dissenting). Ray Nagin accepted bribes. So did Henry Mouton. But the question is not whether Nagin and Mouton are crooks. The question is whether Waste Management can use civil RICO against a competitor with *zero* evidence of causation. With greatest respect for my colleagues and their views on this difficult case, I'd say no.

I.

Long ago, we worried that summary judgment could be a "catch penny contrivance to take unwary litigants into its toils and deprive them of a trial." *Whitaker v. Coleman*, 115 F.2d 305, 307 (5th Cir. 1940). That view was common at the time. In the years following the adoption of Rule 56 in 1938, "the courts [were], if anything, overhesitant in granting the relief." Charles E. Clark, *Summary Judgments—a Proposed Rule of Court*, 2 F.R.D. 364, 366 (1943); *see also* Charles E. Clark & Charles U. Samenow, *The Summary Judgment*, 38 YALE L.J. 423 (1929) (explaining the need for a summary judgment rule). The hesitancy was rooted in an institutional concern that summary judgment would transgress the sanctity of the jury room. *See, e.g.*, *Avrick v. Rockmont Envelope Co.*, 155 F.2d 568, 571 (10th Cir. 1946) ("The power to pierce the flimsy and transparent factual veil should be temperately and cautiously used lest abuse reap nullification.").

Then came 1986. In a trilogy of summary-judgment opinions, the Supreme Court told us we had it all wrong. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Each was a landmark in its own right. And each held the lower federal courts were unduly penurious in meting out summary judgment.

No. 18-30139

Take *Matsushita*, for example.  American television manufacturers sued Japanese competitors for predatory pricing.   The plaintiffs alleged their Japanese competitors had conspired to drive down prices and put the Americans out of business.  The Third Circuit found myriad material factual disputes that precluded summary judgment for the defendants.  For example, it highlighted evidence the Japanese companies entered "formal agreements" to fix minimum prices, undercut those agreements through "a variety of rebate schemes," and concealed the rebates from both the American and Japanese governments.  *Matsushita*, 475 U.S. at 581.  And it was undisputed the Japanese companies entered *other* price-fixing conspiracies.  *See id.* at 595–96 (conceding "direct evidence" of such).  Obviously, in the abstract, one could believe the Japanese conspirators had conspired once again.

Still, the Supreme Court reversed the denial of summary judgment.  Two of its reasons apply directly here.  First, the Court held the American plaintiffs "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action."  *Id.* at 588.  Put differently, the plaintiffs must present evidence that "tends to exclude the possibility" their competitors acted innocently.  *Ibid.* (quotation omitted).  Second, and crucially, the Court held evidence of other conspiracies is *insufficient* to bridge that gap.  Sure, the Court conceded, it's possible the Japanese companies were up to their old conspiratorial tricks.  But "their conduct [was also] consistent with other, equally plausible explanations"—including a non-conspiratorial desire to gain market share by driving down prices.  *Id.* at 596–97.  That the Japanese companies conspired in the past would not allow a jury to reasonably infer they conspired again.

We've generally heeded the Supreme Court's admonishment.  We've recognized that the *Celotex-Anderson-Matsushita* "trilogy . . . made it clear that our earlier approach to Rule 56 was wrong-headed because it was simply

24

inconsistent with the plain language of the rule." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (citations omitted); *see also Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1423 (5th Cir. 1996) (en banc) (noting "the growing judicial recognition of the many benefits of summary judgment"), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1); *Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993) (similar). And we've held "[t]estimony based on conjecture or speculation is insufficient to raise an issue of fact to defeat a summary judgment motion." *Ruiz v. Whirlpool, Inc.*, 12 F.3d 510, 513 (5th Cir. 1994) (following *Anderson*). Put differently, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075 (quotation omitted); *accord Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) ("The question is not whether the plaintiff's inferences are so far-fetched that a trier of fact should not be allowed to consider them, but whether the evidence, though not far-fetched, sufficed to meet the plaintiff's burden of proof." (alterations and citation omitted)).

## II.

This case certainly smells fishy. River Birch made campaign donations to Mayor Nagin, who refused to reauthorize the landfill of River Birch's competitor, Waste Management. But if *Matsushita* teaches us anything, it's that foul-smelling facts don't preclude summary judgment. We should be especially careful to heed that lesson in civil RICO cases like this one. Before asking a jury to separate official acts motivated by bribery from those motivated by the public interest, we should be quite sure there is *some* evidence that could satisfy the plaintiff's burden of proof.

A.

The dispute at the heart of this case is *why* Mayor Nagin refused to reauthorize a landfill.  There's an innocent explanation:  The landfill was politically unpopular, and Nagin did not want to continue taking political heat for authorizing it.  Then there's a sinister explanation:  River Birch bribed him.

A straightforward application of *Matsushita* precludes asking a jury to choose between them.  As in *Matsushita,* it's the plaintiff's burden to connect its injuries to its competitors' alleged conspiracy.  To carry that burden, Waste Management must produce evidence that "tends to exclude the possibility" Mayor Nagin was motivated by politics rather than bribes.  475 U.S. at 588 (quotation omitted).  Evidence that is "as consistent with" politics as it is with bribes does not suffice because it does nothing to help the jury choose between "competing inferences."  *Ibid.*

The evidence of Nagin's political motivations is undisputed and overwhelming.  Waste Management attempts to overcome that evidence in various ways.  They make all involved look, well, trashy.  But they fail to create a jury question.

1.

Let's start with the undisputed evidence of Nagin's independent motivation to close the landfill.  This landfill was wildly unpopular.  Everyone hated it.  Waste Management's predecessor in interest attempted to open it in the mid-1990s.  The New Orleans City Council rejected the effort.  Waste Management purchased an option to try again in 2001 and 2002.  It too failed.

Then came Hurricane Katrina.  That catastrophe made the politically impossible possible—at least temporarily.  On February 9, 2006, Mayor Nagin issued an emergency executive order.  It allowed Waste Management to open the landfill immediately and secure Council approval for it later.  Even in the

immediate aftermath of Katrina—when the need for new landfills was patent—the political backlash was swift and vicious.

Before the landfill could open on an emergency basis, the City Council issued a scathing rebuke of the project.  In a unanimous resolution, the Council noted "a great majority" of the affected residents voiced "vehement opposition" to the landfill.  New Orleans City Council Resolution R-06-156, at 1 (Apr. 6, 2006).  It noted the Mayor had bypassed all "public input" in unilaterally issuing the emergency order.  *Ibid.*  It noted the federal government had not determined the levee system surrounding the landfill was "safe."  *Id.* at 1.  Moreover, the Mayor had not determined his chosen landfill was the best of the "environmentally sound alternatives."  *Id.* at 2.  The Council therefore unanimously and "strongly urge[d]" the Mayor to revoke his order "immediately."  *Id.* at 2.  And it again emphasized its resolution was "based upon overwhelming community opposition" to the landfill.  *Id.* at 1.

The political opposition was so strong it was literally national news.  *See, e.g.*, Leslie Eaton, *A New Landfill in New Orleans Sets Off a Battle*, N.Y. TIMES (May 8, 2006).  There's not a scintilla of evidence this political fury was fake.  This was not some "AstroTurf" campaign financed by the defendants.  For example, Councilwoman Cynthia Hedge-Morrell opposed the landfill because it "would harm the environment and lessen the possibility that people would return to New Orleans East."  By all accounts, this was genuine grassroots outrage about the prospect of an eighty-foot trash tower in a poor neighborhood populated predominantly by people of color.  There is no dispute this outrage gave Nagin ample political motivation not to renew the landfill's emergency authorization.

Nor is there a scintilla of evidence that anyone thought the Mayor's emergency order was anything other than temporary.  The order suspended the zoning laws "for a period of six months unless earlier rescinded by [the

Mayor] or other operation of law." As an expressly bargained-for condition of the order, Waste Management "stated its plan to file" the same zoning application required of every other landfill operator in New Orleans. The Mayor also expressly bargained for Waste Management's help in creating political support for the landfill through "the appropriate neighborhood meetings." So as things stood on February 9, 2006, Waste Management had up to six months to get its ducks in a row—to open the landfill, sell the plan to affected citizens, win support for it on the City Council, and finish its paperwork. And Waste Management had a *maximum* of six months to do all that. By its terms, after all, the order could be rescinded at any time.

So how could Waste Management think—but for any intervening bribery—it was in the clear? Well, it didn't. According to its emails, Waste Management knew it had a maximum of six months to complete a task list that had proved impossible for a decade. And it also knew the effort would require heavy political lifting. That's why Waste Management had a "Gov Affairs Strategy Meeting" to discuss both "How do we keep [the landfill] open beyond [the] 6 month order?" and "How do we manage [the situation] politically?"

Waste Management apparently wanted to manage this politically by convincing Mayor Nagin to extend his emergency order—and continue shouldering political blame for the landfill. But there is no evidence Mayor Nagin wanted to continue facing criticism for unilaterally authorizing the landfill. When pressed at its Rule 30(b)(6) deposition to identify *anything* to suggest it *ever* convinced the Mayor to be the political fall-guy (again), Waste Management could say only that some unidentified person who may or may not work for some government entity may or may not have "implied" it at some unspecified time in some unspecified way.

Of course, it's possible that—but for the defendants' campaign contributions—Nagin wanted to continue shouldering the political blame for

No. 18-30139

an eight-story garbage pile in voters' backyards. It's possible Nagin wanted to repeat the decision that earned him a unanimous rebuke from the City Council, scathing coverage in the *New York Times*, and vehement opposition back home. Anything is possible. But there's no evidence of it. Much less is there evidence the Mayor changed his mind and opposed a politically unpopular landfill *because of* River Birch's four campaign contributions.[1]

2.

But wait, says Waste Management: These are not ordinary campaign contributions because Nagin took bribes in other instances. Therefore, they say, the jury could find he did so here.

It's true Nagin is in prison for accepting unrelated bribes. It's also legally irrelevant.

In *Matsushita*, the Third Circuit relied on "direct evidence" the Japanese television makers had engaged in price-fixing conspiracies in Japan. *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 305 (3d Cir. 1983), *rev'd sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). It held evidence of these other conspiracies "may be circumstantial evidence of a broader conspiracy." *Ibid.* And it further held such circumstantial evidence precluded summary judgment because, after all, a reasonable jury could infer once a conspirator, always a conspirator. It's also

---

[1] The entirety of defendants' alleged bribes are four publicly reported campaign contributions of $5,000, all made on May 16, 2006. To put these numbers in perspective, Nagin reported $590,747.00 in contributions for the seven-week period between May 1 and June 19, 2006. *See Candidate's Report, Report Number 10056*, LA. ETHICS ADMIN. PROGRAM, 1–2 (filed June 27, 2006), http://ethics.la.gov/CampaignFinanceSearch/ShowEForm.aspx?ReportID=10056. The defendants' $20,000 constitutes a mere 3% of that seven-week total. And across the 2006 primary and general election, Nagin spent $2,491,147.95. *See* Brian Brox, *Elections and Voting in Post-Katrina New Orleans*, SOUTHERN STUDIES: AN INTERDISCIPLINARY JOURNAL OF THE SOUTH, Fall/Winter 2009, at 8, 15. The defendants' $20,000 is 0.8% of that total. The record does not reveal a reason to think these relatively small sums of money loomed larger in Mayor Nagin's calculus than the obvious political implications of reauthorizing the landfill.

easy to see how documented, direct proof of conspiracies back in Japan would powerfully impeach any denial of conspiracies in the United States.

I likewise agree with my esteemed colleagues "a jury could infer that Nagin's acceptance of bribes, while holding public office, was a part of his 'pattern of conduct' or 'modus operandi.'" *Ante*, slip op. at 15. And I agree Nagin's bribery conviction would serve as powerful impeachment of his testimony. *Ibid.* But that sort of evidence did not change the propriety of summary judgment in *Matsushita*. Nor should it here.

That's because surviving summary judgment requires more than character evidence and impeachment material. In RICO conspiracies, like antitrust ones, the plaintiff has an affirmative obligation to negate other innocent explanations for the defendants' conduct. And the Supreme Court could not have been clearer in holding other bad acts won't do the trick:

> The "direct evidence" on which the court [of appeals] relied was evidence of *other* combinations, not of a predatory pricing conspiracy. . . . Evidence that tends to support any of these collateral conspiracies thus says little, if anything, about the existence of a conspiracy to charge below-market prices in the American market over a period of two decades.

*Matsushita*, 475 U.S. at 595–96.

This was no fleeting thought. It was a thoroughly reasoned response to the principal basis for the dissent, which criticized the majority for "mak[ing] assumptions that invade the factfinder's province." *Id.* at 601 (White, J., dissenting). Justice White explained:

> [A]fter reviewing evidence of cartel activity in Japan, collusive establishment of dumping prices in this country, and long-term, below-cost sales, the Third Circuit held that a factfinder could reasonably conclude that the [illegal horizontal agreement] was not a simple price-raising device. . . . I see nothing erroneous in this reasoning.

*Id.* at 605.  Justice White's understanding of the summary judgment standard would obviously necessitate reversal here.  But "[t]his is one of those instances in which the dissent clearly tells us what the law is not.  It is not as if the proposition had not occurred to the majority of the Court."  *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1188 (10th Cir. 2014).[2]

The majority responds that *Matsushita* is irrelevant because this is not an antitrust case.  *See ante*, slip op. at 19–20.  But *Matsushita* "did not introduce a special burden . . . in antitrust cases"; it "merely articulated" a requirement applicable to *all* cases under Rule 56.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992).  That's why courts routinely apply *Matsushita* in non-antitrust cases.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 235 (7th Cir. 1995); *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir. 1987).  "[T]he universal applicability of the Supreme Court's analysis in *Matsushita*" is well established.  *In re Managed Care Litig.*, 430 F. Supp. 2d 1336, 1345 (S.D. Fla. 2006).  That's because *Matsushita* requires summary judgment *anytime* the evidence is "as consistent with" lawful conduct as with unlawful conduct.

True, other parts of *Matsushita*'s reasoning are not relevant here.  For example, no one argues that Nagin "lack[ed] a plausible motive for" accepting a bribe or that the alleged bribery scheme "ma[kes] no economic sense."  *Ante*,

---

[2] Given that prior-crimes evidence doesn't help with Nagin, it definitely doesn't help with Mouton.  Mouton regulated shrimping.  The only evidence tying him to the landfill is a letter he sent to the EPA regarding a citizen suit.  He never met Nagin, never worked for him, never talked to him (about the landfill or anything else), and never had any influence over him.  Accordingly, Waste Management cannot show Mouton was connected in any way to Nagin, much less that he caused Nagin to refuse to reauthorize the landfill.  *Cf. Boyle v. United States*, 556 U.S. 938, 947 n.4 (2009) (individuals who act "independently and without coordination" are not part of RICO association).  Mouton is irrelevant.

No. 18-30139

slip op. at 18–19 (characterizing *Matsushita*).  But the "economic rationality" of the alleged conduct, *ante*, slip op. at 20 n.53, does not justify a trial in this case, just as it wouldn't have in *Matsushita*.  The *Matsushita* Court expressly denied that "a plausible reason to conspire" combined with "ambiguous conduct could suffice to create a triable issue of conspiracy."  475 U.S. at 597 n.21.  Regardless of economics, "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy."  *Ibid.*

Other lower courts have attempted the majority's move, and it did not end well.  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court issued another landmark procedural ruling in an antitrust case.  Some argued *Twombly*'s reading of Federal Rule of Civil Procedure 8 should be limited to "the context of an antitrust dispute."  *Ashcroft v. Iqbal,* 556 U.S. 662, 684 (2009).  But the Court emphatically rejected that argument.  *Twombly*—like *Matsushita*—"interpret[ed] and appli[ed]" the Federal Rules of Civil Procedure, which govern "all civil actions and proceedings in the United States district courts."  *Ibid.* (quotation omitted).  So *Matsushita*—like *Twombly*—applies to all cases, not just antitrust ones.

But even if that weren't true, *Matsushita* would remain applicable to civil RICO cases like this one.  "Antitrust cases are particularly instructive in the civil RICO context because, as the Supreme Court has observed, 'the civil action provision of RICO was patterned after the Clayton Act.'"  *In re Managed Care Litig.*, 430 F. Supp. 2d at 1345 (quoting *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150 (1987)).  The majority simply cannot ignore *Matsushita* as just "an antitrust case."

3.

Waste Management also claims to have three pieces of evidence tending to show the defendants' campaign contributions caused the Mayor to change his mind. They tend to show no such thing.

The first is an "Emergency Disaster Cleanup Site Request" filed by the Mayor's office on February 14, 2006. The Mayor's office filed it five days after Nagin signed his emergency order. Through it, Nagin asked the Louisiana Department of Environmental Quality ("LDEQ") to provide emergency state approval for the landfill. And in it, Nagin requested state approval for "the duration of the Hurricane Katrina disaster cleanup efforts, at this time estimated to be 12 months." But that says nothing about whether Nagin was willing to wage political war against his City Council for 12 months. There's nothing illegal about wanting the State to approve a landfill for 12 months and demanding political buy-in from the City Council in half that time. Moreover, the LDEQ request was filed almost two months *before* the Council formally excoriated Nagin for authorizing the landfill. To the extent the LDEQ request shows Nagin changed his mind, it is perfectly consistent with his doing so in response to a bruising political fight. As we know from *Matsushita*, that consistency precludes this case from reaching a jury.

The second piece of evidence is a city press release from June 30, 2006. That release was headlined "Lab Results Show No Air or Water Contaminations at Chef Hwy Landfill." And it attributes a quote to Nagin, who hoped the sampling results would "ease the concerns of the citizens." But environmental concerns were only one of the reasons the landfill was a political mess. The city's leaders also worried the landfill would displace a community of color. *See, e.g.*, Affidavit of Councilwoman Cynthia Hedge-Morrell. No amount of lab sampling would change that. And in all events, the landfill was a political albatross around the Mayor's neck. There is nothing illegal about

an elected official using favorable test results to defend against a political liability. Nor is there anything irrational about making the best of a bad political situation in June before cutting bait in August.

The third piece of evidence is a letter from the LDEQ dated July 14, 2006. In it, LDEQ officials said they "were surprised" to learn of Nagin's decision not to renew his emergency authorization for the landfill. "It has been our understanding and impression," they wrote, "that you supported the use of the Chef Menteur site to dispose of" hurricane debris. The city attorney responded that the city is not "oppos[ed]" to the landfill. To the contrary, the city attorney expressly stated the LDEQ would be "justified" in authorizing the landfill at *the state level*. Nagin simply refused to continue waging a lone-ranger political war against his City Council at *the local level*. In short, if the State was willing to take the blame, all the better—but Nagin was not going to take it himself. Far from supporting an inference Nagin was motivated by bribes from River Birch, this last piece of evidence suggests he was motivated by politics.

B.

Make no mistake. Like my colleagues, I am convinced post-Katrina local politics were odiferous. And sometimes criminal. Still, that does not mean Waste Management's civil RICO claim against River Birch is the proper remedy.

"Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991). The statute punishes defendants with treble damages, attorney's fees, and the "stigmatizing" label "racketeer." *Ibid.* That alone gives even "spurious claims" tantalizing "*in terrorem* settlement value." *Haroco, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 747 F.2d 384, 399 n.16 (7th Cir. 1984), *aff'd*, 473 U.S. 606 (1985).

But that's not the worst of it. "RICO has been interpreted so broadly that it has been used more often against respected businesses with no ties to organized crime, than against the mobsters who were the clearly intended target of the statute." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 526 (1985) (Powell, J., dissenting); *see also id.* at 499 (majority op.) ("It is true that private civil actions under the statute are being brought almost solely against [respected businesses], rather than against the archetypal, intimidating mobster."). The predicate acts for civil RICO are *so* broad that racketeering claims are *de riguer* in commercial litigation. In the words of Abner Mikva—who voted against RICO as a member of Congress before applying it as a judge on the D.C. Circuit—civil RICO is "a weapon against legitimate businessmen in ordinary commercial disputes. The civil RICO count today has become boilerplate in commercial lawsuits." Abner Mikva & G. Robert Blakey, *RICO and its Progeny: Good or Bad Law?*, 2 NOTRE DAME J.L. ETHICS & PUB. POL'Y 369, 372 (1986).[3]

To be clear, I am not saying any particular person involved in this commercial dispute is or is not a legitimate businessman. What I am saying is equal justice under the law applies equally to crook and cherub. *Cf.*

---

[3] At a debate hosted by Notre Dame, Mikva explained:

In preparing for my appearance here today, I went through some of the cases in which a civil RICO claim has been filed. And the range of cases boggle[s] the mind. These are not cases against Mafia figures. These have nothing to do with some poor merchant who has been squeezed by the mafiosi in a loan transaction. RICO makes its appearance in everything from divorce suits to religious disputes, to suits against one of the national candidates for President, to a major political party, and to just about every kind of garden variety of contractual and securities dispute that you could imagine between businessmen, to corporate raids, to defenses against corporate raids, to state efforts to collect state sales taxes from local businessmen.

If you find it hard to relate that potpourri to organized crime or racketeering, you are not alone.

*Id.* at 371.

*Kimmelman v. Morrison*, 477 U.S. 365, 380 (1986) ("The constitutional rights of criminal defendants are granted to the innocent and the guilty alike."); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 195 (1978) ("Yes, I'd give the Devil benefit of law, for my own safety's sake." (quoting ROBERT BOLT, A MAN FOR ALL SEASONS, Act I, p. 147 (Three Plays, Heinemann ed. 1967)). And regardless of the merits in this case, we must worry the rules we devise today will ensnare innocent civil RICO defendants tomorrow. *Cf. Haroco*, 747 F.2d at 399 n.16 ("After all, the line between fraud and mistake or misunderstanding can be a very fine one. It is, therefore, important that, in the further development of civil RICO, criminal fraud be clearly distinguished from less egregious conduct.").

The error costs are particularly high here because this case combines civil RICO with the First Amendment. The First Amendment protects political speech. *See Citizens United v. FEC*, 558 U.S. 310, 339–40 (2010). That includes large donations to candidates and committees. *See McCutcheon v. FEC*, 572 U.S. 185, 203–04 (2014) (plurality); *id.* at 230–31 (Thomas, J., concurring in the judgment). Of course, the First Amendment does not protect "'*quid pro quo*' corruption." *Id.* at 192. But if we're not careful, our efforts to carve out unprotected speech can run headlong into the core of the First Amendment. *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (noting Congress can criminalize some kinds of lying, but it must be careful not to "chill" protected speech). If we are unwilling to rigorously apply Rule 56, future would-be speakers may remain silent rather than risk a civil RICO trial.

Again, 1986's summary-judgment trilogy provides a way out of this box. The Supreme Court directs us to consider "the actual quantum and quality of proof necessary to support liability." *Anderson*, 477 U.S. at 254. That means a summary-judgment court must consult the underlying substantive law. *See*

36

*ibid.*; *Matsushita*, 475 U.S. at 597–98.  Here, the underlying law includes both the First Amendment (as in *Anderson*) and conspiracy (as in *Matsushita*).  It also includes the line between political speech and corruption (as in *McCutcheon*).  Putting all of that together, Waste Management can survive summary judgment *only* by pointing to *some* evidence of "'*quid pro quo*' corruption."  *McCutcheon*, 572 U.S. at 207.  This, the majority concedes, Waste Management cannot do.  *See ante*, slip op. at 14.

\*    \*    \*

This is a tough case.  We have not one but two individuals who were convicted of taking bribes.  We have the rough-and-tumble local politics of post-Katrina New Orleans.  And we have fierce competitors in the landfill industry.  The majority and I disagree about whether all of this belongs in front of a civil RICO jury.  But I think our disagreement is driven more by this case's facts than by a fundamental disagreement about the post-1986 summary judgment standard.  And I don't read the majority to allow any of these issues to reach the jury—including, for example, whether the Mayor "disregard[ed]" his policy advisors, *ante*, slip op. at 17—without the totality of the facts presented in this highly unusual case.

No one finds these facts more troubling than I do.  But as Justice Scalia once said, "[t]he judge who always likes the results he reaches is a bad judge." Clare Kim, *Justice Scalia: Constitution Is "Dead,"* MSNBC (Oct. 2, 2013, 10:03 PM),  http://www.msnbc.com/the-last-word/justice-scalia-constitution-dead.   I don't like granting summary judgment to campaign-finance violators.  Nor do I like giving the benefit of the doubt to disgraced ex-government officials.  But, in the absence of evidence, it's what the law commands.  I respectfully dissent.