# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 7, 2018

Lyle W. Cayce
Clerk

No. 18-30019

LOUIS R. KOERNER, JR., Individually and as Assignee of Jean McCurdy Meade,

      Plaintiff - Appellant

v.

CMR CONSTRUCTION & ROOFING, L.L.C.,

      Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JONES, CLEMENT, and SOUTHWICK, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

This case is about a roof. A perpetually leaky roof that Louis Koerner could never seem to get CMR Construction & Roofing LLC to fix. Koerner challenges the district court's decision setting aside CMR's default, its grant of summary judgment in CMR's favor, and its denial of his Rule 59(e) motions for reconsideration. These three challenges call upon this court to answer a myriad of sub-issues. But in the end, we find no error and affirm.

I.

In the aftermath of Hurricane Katrina, in late 2005 and early 2006, CMR sold a Slate 2.0 roof to Koerner and installed it. CMR periodically returned to

No. 18-30019

perform warranty and repair work in 2006, 2007, 2011, and early 2012. And despite CMR's contention that its workmanship was not to blame, it paid a contractor to conduct additional repairs in November 2012.

In April 2016, Koerner sued his insurer, Vigilant Insurance Company, in state court alleging that his home required several repairs. The case was removed to federal court. Thereafter, Vigilant denied Koerner's claim for roof repairs by citing the faulty-workmanship exclusion to his policy, which implicated CMR. Koerner moved to join CMR as a defendant, and the district court granted the motion.

Koerner served CMR with a complaint and summons; however, the cover sheet misnamed CMR. When CMR failed to respond to the complaint, Koerner was granted an entry of default and a partial default judgment against CMR for nearly $500,000. Finally roused to action, CMR successfully moved to set aside the default, claiming that (1) it did not willfully ignore the complaint, (2) Koerner would suffer no harm or prejudice if the default were set aside, and (3) it had meritorious defenses. After several months of discovery, CMR filed a motion for summary judgment, which was granted. That same day, the district court entered final judgment dismissing all of Koerner's claims.

Koerner timely filed two motions under Rule 59(e), one to amend the district court's interlocutory ruling setting aside the entry of default and partial default judgment, and another to amend the summary-judgment order. Koerner's motions introduced new evidence to impeach CMR's denial of willfully failing to respond to the initial complaint and to contest the summary-judgment order. On November 15, 2017, the district court summarily denied Koerner's motion to amend the entry of default and partial default judgment. And on January 4, 2018, the court denied the motion to amend the summary-judgment order. This appeal followed.

2

No. 18-30019

II.

Koerner first challenges the district court's decision to set aside the entry of default and vacate the partial default judgment.

Under Rule 55(c), a district court "may set aside an entry of default for good cause." Fed. R. Civ. Pro. 55(c). To decide if good cause exists, courts consider three non-exclusive factors: "whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) (internal quotation mark omitted). "A finding of willful default ends the inquiry, for 'when the court finds an intentional failure of responsive pleadings there need be no other finding.'" *Id.* (quoting *In re Dierschke*, 975 F.2d. 181, 184 (5th Cir. 1992)).

Defaults are "generally disfavored." *Mason & Hanger-Silas Mason Co. v. Metal Trades Council of Amarillo, Tex. & Vicinity, AFL-CIO*, 726 F.2d 166, 168 (5th Cir. 1984). "Unless it appears that no injustice results from the default, relief should be granted." *In re OCA, Inc.*, 551 F.3d 359, 370–71 (5th Cir. 2008). We review a district court's decision to set aside an entry of default or a default judgment for an abuse of discretion. *Lacy,* 227 F.3d at 291–92. Determining whether a defendant willfully defaulted is a factual finding that we review for clear error. *Wooten v. McDonald Transit Associates, Inc.*, 788 F.3d 490, 495 (5th Cir. 2015).

The district court dutifully applied these good-cause factors. Koerner challenges only the analysis of the willfulness factor, so we too will evaluate only that factor.

The district court held that "CMR was not intentionally failing to respond to litigation or trying to be uncooperative or obstructionist." The court based this holding on an affidavit from CMR's President, Steven Soulé. According to Soulé, he believed that it was too late for Koerner to sue CMR

3

No. 18-30019

because the allegations dated from 2005 and 2006. He also believed that CMR was not actually involved in the lawsuit because the only defendant named in the caption was Vigilant and because the cover sheet sent to CMR by its registered agent was incorrectly addressed to "CMR Construction & Roofing of Texas, LLC" instead of "CMR Construction & Roofing, LLC." Upon confirming that the cover sheet misnamed CMR, the district court held, "[a]lthough Soul[é] certainly acted unwisely in failing to contact an attorney upon receiving the summons for this litigation, under the circumstances Soul[é]'s negligence is insufficient to warrant a finding of willfulness."

Koerner objects to the characterization of CMR's conduct as negligent. Specifically, Koerner argues that Soulé was dishonest in his affidavit and that CMR had sufficient notice of the lawsuit to infer that its failure to respond was intentional, notwithstanding the cover sheet. Koerner grounds this claim in a series of communications between himself and Soulé in February 2016. These consisted primarily of one-way demands by Koerner via email, phone, and text in which Koerner told Soulé there was a lawsuit pending against CMR and that CMR would be in default if it failed to respond. Given these repeated contacts, he insists that CMR's "supposedly good faith error" does not justify setting aside the entry of default and partial default judgment.

While we agree that Koerner's proffered evidence could support a willfulness inference, Soulé's affidavit, if believed, supports the contrary inference. Given the record as a whole, we cannot say the district court clearly erred when it chose to credit Soulé's affidavit over Koerner's evidence. Consequently, the district court did not abuse its discretion in setting aside the entry of default and partial default judgment.

III.

Koerner next challenges the district court's summary denial of his Rule 59(e) motion to reconsider the order setting aside the entry of default and

4

partial default judgment. That motion contained additional evidence impeaching Soulé's affidavit—the only evidence supporting the non-willfulness finding.

"Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). "There is no requirement that reasons be stated for the denial of a motion for reconsideration under Rule 59(e)," especially if "valid—indeed compelling—reasons for denying the motion are obvious and apparent on the face of the record." *Briddle v. Scott*, 63 F.3d 364, 381 (5th Cir. 1995).

Koerner was not entitled to this extraordinary relief, and there is an obvious reason on the face of the record why this is so. To be granted, a Rule 59(e) motion "'must clearly establish either a manifest error of law or fact or must present newly discovered evidence' that was not available before the judgment issued." *Molina v. Equistar Chemicals LP*, 261 F. App'x 729, 733 (5th Cir. 2008) (quoting *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003)). The district court set aside the default in May 2017. The evidence that Koerner attached to his Rule 59(e) motion came to light after Soulé's deposition on August 25, 2017. The court entered final judgment on October 18, 2017. Thus, because the evidence came to light before final judgment was entered, relief under Rule 59(e) was improper.

Koerner should have instead filed a Rule 54(b) motion while the case was still open. Under that rule, district courts can amend interlocutory orders for any reason they deem sufficient before final judgment is entered. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336–337 (5th Cir. 2017) (describing the differences between Rule 59(e) and Rule 54(b)). But in the interest of finality, Rule 59(e) sets a much higher threshold for relief once judgment is entered. *Id.*

No. 18-30019

Koerner actually admits that he could have filed a Rule 54(b) motion, but he says that he did not do so because they are disfavored for having the potential to interfere with the underlying case's progress. He cites no cases for this perplexing proposition. We fail to see how sitting on potentially dispositive evidence until the district court completes more work and enters final judgment on a summary-judgment motion is preferable to correcting error as soon as possible.

Koerner made a poor tactical decision by waiting until after final judgment to bring the new evidence forward. But the fact remains: the evidence was available before final judgment was entered, so he is not entitled to the extraordinary relief that Rule 59(e) provides.

IV.

Finally, Koerner argues that the district court erred in granting summary judgment on (1) the fraud claim stemming from the 2006 purchase of his roof, (2) the claims related to the 2011 repairs, and (3) the negligence, fraud, and detrimental-reliance claims surrounding the 2012 repairs. After reviewing the district court's grants of summary judgment de novo, we find no error in any of the district court's conclusions.[1]

The question at summary judgment is whether "the record, taken as a whole, could . . . lead a rational trier-of-fact to find for the non-moving party." *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013) (defining a genuine dispute of material fact). "Credibility determinations have no place in

---

[1] Koerner also faults the district court for failing to give him adequate notice of the grounds upon which it granted summary judgment. We need not address this argument because after reviewing all the evidence submitted on appeal, we do not believe that there is any dispute of material fact on any of Koerner's claims. *See Ross v. Univ. of Tex. at San Antonio*, 139 F.3d 521, 527 (5th Cir. 1998) ("[F]ailure to provide notice may be harmless error . . . . if all of the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine issue of material fact." (internal citation and quotation mark omitted)).

No. 18-30019

summary judgment proceedings" because "non-movants' summary judgment evidence must be taken as true." *Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir. 1994). All facts and inferences must be viewed in the light most favorable to the non-movant. *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 770 (5th Cir. 2000). However, "[s]elf-serving allegations are not the type of significant probative evidence required to defeat summary judgment," and "a vague or conclusory affidavit [without more] is insufficient to create a genuine issue of material fact in the face of conflicting probative evidence." *Kariuki*, 709 F.3d at 505 (internal quotation marks omitted). Therefore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of . . . summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). With this familiar standard in mind, we turn to Koerner's claims.

## A.

Koerner maintains that in 2006 CMR fraudulently induced him to purchase a roof made of Slate 2.0. His only evidence: his two declarations made under penalty of perjury. In those declarations, he states that Eric Hunter, a CMR representative, told him that Slate 2.0 had all the same attributes as traditional slate but was better in every meaningful way. This representation, Koerner claims, was false. Slate 2.0 actually differs from traditional slate in that it consists of decorative slate facade over a synthetic membrane. Had he known that it was the membrane—not the slate itself, as in traditional slate— that provides most of the protection against the elements, Koerner claims that he would not have purchased the roof from CMR.

To establish fraud involving a contract under Louisiana law, a plaintiff must prove three elements: "(1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause

7

damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract." *Shelton v. Standard/700 Associates*, 798 So. 2d 60, 64 (La. 2001). Additionally, a contractual fraud claim will not lie if "the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill." La. Civ. Code Ann. art. 1954; *see also Cashman Equip. v. Acadian Shipyard, Inc.*, 66 F. App'x 524 (5th Cir. 2003) (per curiam).

Koerner's claim does not survive summary judgment for two reasons. First, Koerner puts forth no competent evidence of fraudulent intent. He simply asserts in his declaration that Hunter "knew," but concealed, the differences between Slate 2.0 and traditional slate. But this is a topic about which Koerner could have no possible personal knowledge. His speculative opinion as to what Hunter knew and did not know cannot defeat a summary-judgment motion. And without any other evidence that Hunter intentionally misled Koerner, he cannot prove his fraud claim.

Second and more importantly, Koerner could have easily ascertained the truth about Slate 2.0's qualities. Slate 2.0 differs from traditional slate in two ways. First, the Slate 2.0 tiles sit flush against each other—as opposed to being partially overlaid as in traditional slate. And second, because of this, Slate 2.0 relies more on the synthetic membrane to keep out the elements—whereas traditional slate uses felt and relies primarily on the actual slate for protection. Koerner was aware of both differences. He admitted in his declaration that he knew CMR was going to use a synthetic membrane. He also knew, based on his own research, that Slate 2.0 is designed so that the individual tiles do not overlay on each other. Koerner could have easily put these facts together to figure out that what he was purchasing was different than a traditional slate

No. 18-30019

roof and that the Slate 2.0 tiles do less work in keeping out the elements than traditional slate tiles.

Summary judgment was proper on this claim.

B.

Turning to the 2011 repairs, Koerner argues that the district court erred in dismissing Koerner's claims as perempted. We disagree.

The district court held that under Louisiana Revised Statute § 9.2772(A), any claims arising from repairs done to Koerner's roof are subject to a five-year peremptive period. Since Koerner first asserted claims against CMR on November 14, 2016, the district court held that "any claims arising from 'improvement[s]' that Koerner 'occupied'" *prior* to November 14, 2011, would fall outside the required five-year window and be perempted. Koerner does not challenge these premises; he argues only that the 2011 repairs should not have fallen within this five-year period because the 2011 and 2012 repairs were part of the same project. There is no dispute that if the 2011 and 2012 repairs are considered one project, then the 2011 repairs should not have been perempted.

But the only evidence in support of this proposition is one conclusory assertion in Koerner's declaration that "based on [his] understanding," the 2011 repairs were part of a larger remedial project that was not completed until November 2012. But this subjective belief is belied by other more concrete evidence in the record. For example, CMR's job report documented the 2011 job as closed on November 10, 2011. It then separately agreed to do work three months later, in February 2012. After reviewing the record as a whole, we agree with the district court that the 2011 claims are perempted.

C.

As to the 2012 repairs, Koerner alleges three claims: negligence, fraud, and detrimental reliance. Summary judgment was appropriate on all of them.

9

No. 18-30019

i.

Koerner asserts a negligence claim against CMR for the repairs done in November 2012. There is only one problem—CMR did not perform the repairs; a different roofer named Brian Velasquez did. As in the district court, Koerner argues that CMR can be held liable for Velasquez's work because he was CMR's independent contractor. But under Louisiana law, Koerner must point to a valid contract between Velasquez and CMR before he can successfully argue that they had a principal/independent-contractor relationship. *See Bourquard v. L.O. Ausauma Enter., Inc.*, 52 So. 3d 248, 253 (La. Ct. App. 2010). This, he cannot do.

The summary-judgment evidence shows that Koerner entered into a contract with Velasquez—not CMR—to repair his roof in November 2012. It is true that CMR was involved with the repairs in many ways: it agreed to reimburse Koerner for Velasquez's work, set the scope of the work it would reimburse, had some supervisory power over Velasquez, and later assured Koerner that Velasquez's work was complete and done well. None of this, however, is evidence of a contract between CMR and Velasquez. At best, it is evidence of an independent agreement between Koerner and CMR to pay for, supervise, and inspect Velasquez's work. But the transitive property does not apply in contract law. The fact that Koerner had a contract with Velasquez and a contract with CMR does not mean that Velasquez and CMR had a contract with each other. And without a contractual relationship, CMR cannot be held responsible for Velasquez's alleged negligence.

ii.

Koerner claims that CMR fraudulently represented to him that the work scope it was proposing for the November 2012 repairs would fix all of his roof's problems, when it knew the work would not. In support, Koerner relies on an email from Gary Klocke, a CMR superintendent, to his colleagues after

inspecting Koerner's roof saying, "I did not disclose or offer any info on my findings [to Koerner] and simply left [Koerner] assured we are working on correcting his leak issue, after all he is a lawyer and I know they are sneaky :)."

To prove fraud, Koerner must prove that "(1) a misrepresentation of material fact, (2) made with the intent to deceive, (3) caus[ed] justifiable reliance with resultant injury." *Becnel v. Grodner*, 982 So. 2d 891, 894 (La. Ct. App. 2008). Fraud can be predicated on a promise made with no intention of performing, but a "failure to perform as promised or nonperformance of an agreement to do something at a future time" does not evince fraud. *Taylor v. Dowling Gosslee & Assocs.*, 22 So. 3d 246, 255 (La. Ct. App. 2009). Koerner argues that when all inferences are drawn in his favor, Klocke's email shows an intention not to fix all the roof's problems even though CMR told Koerner that it would.

We think otherwise. The email states that Klocke did not want to tell Koerner about all of his particular findings; it does not say that Klocke did not intend to fix the other problems in addition to the leak. He just did not want to tell Koerner about them because he thought Koerner was a sneaky lawyer. Moreover, the entire email makes clear that the other problems Klocke found all relate to the mentioned leak. No reasonable jury could read Klocke's email and infer an intent not to fix the identified problems. They could infer, at most, an intent not to tell Koerner about all of the leak's nitty-gritty details. Without any other evidence of fraudulent intent, Koerner cannot prevail on this claim.

iii.

Koerner's detrimental-reliance claim centers around a single representation: CMR assured him that the work done by Velasquez, a third-party contractor, was complete and would fix all of his roof's problems. The key

question, then, is whether this type of representation can support Koerner's claim.

Detrimental-reliance claims are based on Louisiana Civil Code Article 1967, which states that "[a] party may be obligated by a *promise* when he knew or should have known that the *promise* would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." (emphasis added).

The statute's focus is on one type of representation—a promise. Despite that focus, Koerner argues that the promise requirement is no longer on sure footing. He cites a single 2018 case for the proposition that a simple assertion can give rise to a detrimental-reliance claim. In *Feingerts v. D'Anna*, a lawyer told his client that he could sell his property without consent. A Louisiana appellate court held that this could support a detrimental-reliance claim, reasoning that "whether or not that assertion is labeled a promise or a legal opinion is inconsequential." 237 So. 3d 21, 26 (La. Ct. App. 2018).

*Feingerts* is not convincing. It is out of step with Article 1967's plain text. When interpreting a Louisiana statute, "the words . . . must be given their generally prevailing meaning." La. Civ. Code Ann. art. 11. And when "a law is clear and unambiguous . . . the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. Civ. Code. Ann. art 9. The *Feingerts* court did not follow these principles. It did not even attempt to determine what Article 1967 meant by narrowing its reach to only "promises."

But in *Wooley v. Lucksinger*, another Louisiana court did just that—it attempted to determine the general prevailing meaning of a "promise" because that is the word the statute uses. 961 So. 2d 1228, 1238–39 (La. Ct. App. 2007). The court looked at Black's Law Dictionary, Merriam–Webster's Collegiate Dictionary, and Louisiana's civil jury instructions. All of them were

substantially similar: a promise is a declaration that a person will or will not do something in the future. *Id.* at 1239. Applying this definition, the court found that no promise had been made, so the plaintiff could not prove a detrimental-reliance claim. *Id.*; *see also Saba v. Emerson*, 2016 WL 6427697, at *13 (La. Ct. App. 2016) (rejecting a detrimental-reliance claim by finding no promise in an inspector's construction report that the plaintiffs relied upon to reduce their house's value); *Jones v. Herlin*, 2013 WL 5270547, at *5 (W.D. La. Sept. 17, 2013) (relying on *Wooley*'s definition of promise).

In an unpublished case, this court too has held that the first step in proving a Louisiana detrimental-reliance claim is showing that the defendant made a promise. In *Roxco Ltd. v. Harris Specialty Chemical, Inc.*, we noted that we had sometimes, in the past, described the first element in a detrimental-reliance claim in terms of mere "representations." 85 F. App'x 375, 378 (5th Cir. 2004) (per curiam). But we decided that this description was too general and not consistent with the statute—which, "by its language, requires the representations to be promises." *Id.* We distinguished the old cases by holding that in those cases there was no question that the representation "related to promises or contracts." *Id.*

Since *Roxco,* the Louisiana Supreme Court has been less than precise when listing out the detrimental-reliance elements. It has described the elements as "(1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." *Suire v. Lafayette City-Par. Consol. Gov't*, 907 So. 2d 37, 59 (La. 2005). But while using this broader language, the court used narrower promissory language later in the opinion:

> [T]he basis of detrimental reliance is the idea that a person should not harm another person by making *promises* that he will not keep. Thus, the focus of analysis of a detrimental reliance claim is not whether

13

> the parties intended to *perform*, but, instead, whether a representation was made in such a manner that the *promisor* should have expected the *promisee* to rely upon it, and whether the *promisee* so relies to his detriment.

*Id.* (emphasis added) (internal quotation marks omitted). Importantly, in *Suire* there was no dispute that the representation at issue was the city's promise to pay for damages to a particular property. *Id.*

Post-*Suire*, this court has described the first element inconsistently. We have sometimes described the first element as a representation but described the remaining elements in terms of promises. *See In re Ark-La-Tex Timber Co., Inc.*, 482 F.3d 319, 334 (5th Cir. 2007) (listing the elements as "(1) a representation by conduct or word; (2) made in such a manner that the promisor should have expected the promisee to rely upon it; (3) justifiable reliance by the promisee; and (4) a change in position to the promisee's detriment because of the reliance" (citing *Suire*, 907 So. 2d at 59))*; see also Water Craft Mgmt., L.L.C. v. Mercury Marine*, 426 F. App'x 232, 237 (5th Cir. 2011) (per curiam). We have sometimes ignored altogether *Suire*'s formulation of the first element as a representation, relying instead directly on the statute's promissory language. *See Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 565 (5th Cir. 2005). And we have sometimes repeated verbatim all the elements as *Suire* listed them. *See New Orleans City v. Ambac Assur. Corp.*, 815 F.3d 196, 203 (5th Cir. 2016); *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 254 (5th Cir. 2008). But when doing so, we have continued to emphasize in other parts of the opinions that the representations are normally promises. *See Ambac Assur. Corp.*, 815 F.3d at 203 ("Under Louisiana law, courts have found reliance on promises made outside of an unambiguous, fully-integrated agreement to be unreasonable as a matter of law." (internal quotation marks omitted)); *Audler*, 519 F.3d at 254 (holding that "the focus of analysis of a detrimental reliance

claim is . . . whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it" (internal quotation mark omitted)).

We now resolve any ambiguity in our prior cases and make the following Erie guess. *See Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624,628 (5th Cir. 2000) ("The role of this court is not to create or modify state law, rather only predict it." (internal quotation marks omitted)). We hold that under Article 1967 the existence of a promise is a necessary element of a detrimental-reliance claim. We also adopt *Wooley*'s definition of promise—an assurance to do or not do something in the future. This result is faithful to the clear statutory text and the fact that Louisiana does not favor recovery under a detrimental-reliance theory. *See Allbritton v. Lincoln Health Sys., Inc.*, 51 So. 3d 91, 95 (La. Ct. App. 2010). Under this construction, Koerner's claim fails. CMR did not promise to do or not do anything; it simply assured Koerner that the roof work was done well.

## V.

For the foregoing reasons, We AFFIRM the district court on all grounds.