REVISED

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 25, 2020

Lyle W. Cayce
Clerk

No. 19-30995

Colonial Oaks Assisted Living Lafayette, L.L.C.;
Colonial Oaks Memory Care Lafayette, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

Hannie Development, Inc.; Cedar Crest, L.L.C.; Maurice
Hannie; Nicol Hannie; Joyce Hannie,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:18-CV-1606

Before Davis, Jones, and Willett, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

Slogging through the countless, and exacting, rules of procedure can daunt—and, when not mastered, doom—litigants. But these provisions aren't without purpose. The aim of many rules of civil, criminal, and

No. 19-30995

appellate procedure, is to provide notice—to give the other side fair warning of the claims, charges, or contentions that they must confront.[1]

That's no less true for Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud or mistake be pleaded with particularity.[2] But Rule 9(b) isn't limited in purpose to providing notice and thus, like all procedural rules, protecting resources.[3] It also exists to prevent harm.[4] This heightened pleading standard makes it especially important for courts to weed out those cases with no "reasonably founded hope" of substantiation, even after a long and expensive discovery process,[5] saving courts and litigants time and money.

In this case, Colonial Oaks Assisted Living Lafayette, LLC and Colonial Oaks Memory Care Lafayette, LLC (collectively, Buyers) purchased two care facilities from Hannie Development, Inc. and Cedar

---

[1] *See, e.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (discussing the need to provide parties with fair notice).

[2] Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

[3] *See, e.g.*, *Twombly*, 550 U.S. at 559–60 (describing the significant costs associated with antitrust litigation); *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009) ("Litigation, though necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government.")

[4] *See United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (explaining that Rule 9(b)'s objectives are "ensuring the complaint 'provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs'" (quoting *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994))); 2 James Wm. Moore et al., Moore's Federal Practice § 9.03 [1] [a], at 9–16 to 9–18 (3d ed. 2005).

[5] *Twombly*, 550 U.S. at 559.

No. 19-30995

Crest, LLC (collectively, Sellers). Believing that Sellers made fraudulent—or, at best, negligent—misrepresentations in the parties' sale agreements, Buyers filed suit. In addition to suing Sellers, Buyers also brought claims against Sellers' representatives, Nicol Hannie and Maurice (Mo) Hannie, and Mo's wife, Joyce Hannie, in their individual capacities. At the recommendation of the Magistrate Judge, the district court dismissed all of Buyers' claims with prejudice for failure to state a claim. We agree that Buyers have not stated a plausible claim upon which relief can be granted and affirm.

I

Buyers entered into two separate, but materially identical, Asset Purchase Agreements with Sellers to purchase two Adult Residential Care Provider (ARCP[6]) facilities: Rosewood Retirement & Assisted Living and Cedar Crest Personal Memory Living.

Each APA also included a Holdback Escrow Agreement (HEA), which required the parties to hold 4% of each transaction's sale proceeds in escrow.[7]  These holdback amounts provided the "sole and exclusive" post-closing remedy, except in the case of "fraud, bad faith or intentional misconduct," and they were to be released to Sellers one year after closing, unless Buyers submitted a valid claim to them. The HEAs also included a mandatory arbitration clause.

---

[6] ARCPs are similar, but distinct, from nursing facilities. Unlike ARCPs, nursing facilities provide "nursing services for persons who, by reason of illness or physical infirmity or age, are unable to properly care for themselves." LAC 48:9701. ARCPs, by contrast, provide supportive personal services, supervision and assistance, and activities and health-related services. LAC 48:6801(B).

[7] As with the APAs, the HEAs, for the purpose of our review, are materially identical.

The APAs provided an eight-month due diligence period for Buyers to ensure the Facilities were above board. Those eight months passed without incident, and the parties closed, escrowing the holdback amounts.

In the year following the closing, Buyers pursued arbitration, arguing, among other things, that Sellers had knowingly and intentionally breached the representations and warranties in the APAs. In relevant part, the APAs included two provisions confirming Sellers' compliance with the applicable laws and regulations:

> Each of the Seller and the Facility is in material compliance with each, and is not in material violation of any, applicable Law to which the Facility is subject . . . .

> To the Seller's knowledge, Seller is in compliance in all material respects with all applicable Health Care Laws.

Despite these attestations, Buyers argued, Sellers were in violation of Chapter 68 of the Louisiana Adult Residential Care Provider Licensing Standards,[8] both on the date the APAs were signed and the date of closing. Buyers alleged that the Facilities were, knowingly and intentionally, improperly staffed, based on the needs of the residents, to provide the services required by Chapter 68.

The arbitrator severed this claim from the arbitration proceedings, holding that:

> Buyers' staffing misrepresentation claim is not arbitrable because it is a fraud claim which does not fall within the APA section 18 exclusive remedy provisions. In this instance, according to La. C.C. Art. 1953, "fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain unjust advantage for one party or to cause a loss or

---

[8] *See* LAC 48:1, Chapter 68.

inconvenience to the other." Buyers allege Sellers "intentionally and knowingly breached their contract warranties" by "misrepresenting that the staffing at the facilities comply with the applicable laws." The arbitrator agrees with the argument of the Sellers that the alleged intentional misrepresentation is a claim for intentional misrepresentation, or in other words, fraud.[9]

The parties continued with their arbitration, and the arbitrator ultimately issued a Final Award in favor of Buyers, awarding them more than $50,000 plus costs and fees.[10]

In the meantime, Buyers, with their fraud claims severed from the arbitration, sued Sellers for negligent and fraudulent misrepresentation[11] and the Hannies (in their individual capacities) for fraudulent misrepresentation.

Both Sellers and Nicol Hannie, individually, moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). At the recommendation of the Magistrate Judge, the district court granted Buyers leave to amend to more specifically support their claims against the individual defendants.

---

[9] Mot./Appl. to Modify or Alternatively Partially Vacate Arbitration Awards Ex. G, at 3–4 in Case No. 6:19-CV-00833 (W.D. La. June 27, 2019) (cleaned up). A copy of this Arbitrator's Interim Order No. 5 is not part of the record, but it is in the post-arbitration proceedings in the Western District of Louisiana. As both parties agree, we may take judicial notice of matters of public record, such as Order No. 5, when ruling upon a Rule 12(b)(6) motion. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

[10] The award was confirmed by the district court in a separate proceeding. R. Doc. 18 in Case No. 6:19-CV-00833, 2019 U.S. Dist. LEXIS 130648 (W.D. La. Sept. 16, 2019).

[11] The complaint describes the cause of action as "contractual warranty claims," which Sellers have distilled as being a claim "for fraudulent and/or negligent misrepresent." At the time, Buyers did not contest this description before the district court.

Buyers filed their Amended Complaint, and Sellers and the Hannies once again sought dismissal.[12] This time, the Magistrate Judge recommended that the district court grant the motions and dismiss all claims with prejudice because (1) any claim for negligent misrepresentation was referable to arbitration under the APA, and (2) Buyers had failed to plead sufficient facts to state a fraud claim against Sellers or the Hannies.

The district court adopted the Magistrate Judge's report and recommendation in full, and Buyers now appeal.

## II

We review a district court's dismissal for failure to state a claim de novo, accepting the complaint's well-pleaded allegations as true.[13] A complaint should not be dismissed unless it fails to raise a right to relief above the speculative level.[14]

But because Buyers have raised a fraud claim, the complaint must also survive the particularity requirements of Federal Rule of Civil Procedure 9(b).[15] "At a minimum," this Rule requires Buyers to plead the "who, what, where, when, and how of the alleged fraud," and "where allegations are based on information and belief, the complaint must set forth a factual basis

---

[12] Specifically, Sellers filed a second 12(b)(6) Motion to Dismiss and a Motion for Summary Judgment (on an unrelated issue), which Nicol Hannie joined. Mo and Joyce Hannie filed a separate 12(b)(6) Motion to Dismiss, a Motion to Strike, and a Motion for Sanctions. Only the motions to dismiss are relevant to this appeal.

[13] *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

[14] *Twombly*, 550 U.S. at 55; *see also* FED. R. CIV. P. 12(b)(6).

[15] FED. R. CIV. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061 (5th Cir. 1994).

for such belief."[16] Although the actor's malice, intent, or knowledge "may be averred generally," Buyers "must set forth specific facts that support an inference of fraud."[17] This requirement can be satisfied if Buyers either (1) show the defendants' motive to commit fraud; or (2) identify circumstances that indicate their conscious behavior, "though the strength of the circumstantial allegations must be correspondingly greater."[18]

## III

Buyers argue that the district court erred in dismissing because they adequately stated claims for (1) negligent misrepresentation and breach of contractual representations and warranties against Sellers, (2) fraud against Sellers, and (3) fraud against the Hannies individually. Specifically, Buyers argue that they have sufficiently pleaded Sellers made material misrepresentations in the APAs, either knowingly or negligently, by claiming that the Facilities were in compliance with all laws and regulations when, in fact, they were not.

Regarding Rosewood, which did not provide staff administration of medication as a service, Buyers pleaded that Chapter 68 of the Louisiana Adult Residential Care Provider Licensing Standards requires that only residents who are aware of their medication and its purpose be allowed to self-administer their medication (with or without assistance). They further pleaded that, prior to the sale, Sellers and the Hannies knew that dozens of residents did not actually qualify for self-administration, meaning Rosewood

---

[16] *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (internal quotations omitted).

[17] *Tuchman*, 14 F.3d 1068.

[18] *Id.*; *see also Lovelace*, 78 F.3d at 1018–19.

was not in compliance with Chapter 68 and should have employed qualified nursing staff to administer medication for those residents.

With respect to Cedar Crest, which did provide staff administration of medication, Buyers pleaded that Chapter 68 requires ARCPs to employ both RNs and LPNs for staff administration of medication, yet Cedar Crest only staffed LPNs. Buyers alleged that, based on pre-sale conversations between the Hannies and one of their staff members, Sellers were on notice that Cedar Crest needed to hire an RN to comply with Chapter 68, but knowingly declined to do so.

Finally, Buyers allege that, because the Hannies effectuated the fraud on behalf of Sellers, they are personally liable for any damages Buyers incurred. We first address Buyers' non-fraud claims, and then turn to their allegations of fraud against Sellers and the Hannies.

A

The district court dismissed Buyers' non-fraud claims for negligent misrepresentation and breach of contractual representations and warranties[19] because, as the Magistrate Judge determined, these claims were subject to arbitration. We agree.

First, the text of the APAs explicitly states that the holdbacks "shall constitute the sole and exclusive remedies (*except with respect to Losses arising from fraud, bad faith or intentional misconduct . . .*), for all matters relating to this Agreement, the transactions contemplated hereby and for *the breach of*

---

[19] As the Magistrate Judge observed, the pleadings are "somewhat ambiguous as to the precise classification of the Buyers' claim." Buyers now contend their non-fraud claims included both negligent misrepresentation and breach of contractual representations and warranties under "Count I: Contractual Warranty Claims Against All Defendants."

*any representation, warranty, covenant or agreement contained herein.*[20] Therefore, by the APAs' own terms, Buyers may only recover the holdbacks, governed by the HEAs, for any breaches of representations or warranties, or any other non-fraud claim. And the HEAs require all disputes to be submitted to final and binding arbitration. Buyers cannot now circumvent the plain terms of the APAs and HEAs to seek recovery outside of arbitration and for remedies other than the holdbacks.[21]

Second, even if the text of the APAs and HEAs was not explicit, the arbitrator's order certainly was, unequivocally providing that only the fraud claim was severed from the arbitration proceedings. The arbitrator held that "Buyers' staffing misrepresentation claim is not arbitrable because it is a fraud claim."[22] The arbitrator went on to define "fraud" as being an intentional misrepresentation or suppression of the truth, and then observed that "Buyers allege Sellers 'intentionally and knowingly breached their contract warranties' by 'misrepresenting that the staffing at the facilities comply with the applicable laws.'"[23] And, the arbitrator concluded, "the alleged intentional misrepresentation is a claim for intentional misrepresentation, or in other words, fraud." Order No. 5 demonstrates that the arbitrator was only dismissing Buyers' claims of intentional misrepresentation—fraud. The Order does not reach claims of negligent misrepresentation or non-fraudulent breaches of contract. Because Buyers'

---

[20] Am. Compl. Ex. A, at 53 (emphasis added).

[21] *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218–21 (1985) (holding that district courts must "rigorously enforce" written arbitration agreements, even where doing so would be inefficient, bifurcate proceedings, or result in "piecemeal" litigation).

[22] Mot./Appl. to Modify or Alternatively Partially Vacate Arbitration Awards Ex. G, at 3–4 in Case No. 6:19-CV-00833 (W.D. La. June 27, 2019) (cleaned up).

[23] *Id.*

non-fraud claims were subject to arbitration, the district court did not err in dismissing them.

But that doesn't end our inquiry. Buyers further argue that, even if the non-fraud claims were not excluded from the arbitration, the district court should have either stayed the claims pending arbitration or, alternatively, dismissed the claims *without* prejudice so that Buyers could pursue arbitration. Sellers disagree, arguing that dismissal with prejudice was proper because claim preclusion applies. The law is on Sellers' side.

Claim preclusion, or res judicata, "bars [1] the parties to a prior proceeding or those in privity with them from [2] relitigating the same claims that [3] were subject to a final judgment on the merits [4] by a court of competent jurisdiction."[24] Here, three of the four requirements are easily met: we have the same parties and a valid and final judgment on the merits by a court of competent jurisdiction.[25] The only dispute is whether this action and the arbitration involve the same claims.

As Buyers emphasize, neither of the non-fraud claims were adjudicated in the arbitration, but "claim preclusion applies not only to 'causes of action' raised in pleadings, but also to claims which were raised, or *could have been raised*, as part of the same action."[26] Buyers *could have*

---

[24] *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1287 (5th Cir. 1989).

[25] *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 16 (2001) (Ginsburg, J., concurring) ("[A] valid and final award by arbitration has the same effects under the rules of res judicata . . . as a judgment of a court."); *Grimes v. BNSF Ry. Co.*, 746 F.3d 184, 188 (5th Cir. 2014) ("As a general matter, arbitral proceedings can have preclusive effect . . . ." (emphasis omitted)).

[26] *Lubrizol Corp.*, 871 F.2d at 1287 (emphasis added) (quoting *Aerojet-General Corp. v. Askew*, 511 F.2d 710, 715 (5th Cir. 1975) ("Looking beyond the pleadings to what could

raised their non-fraud claims in the arbitration based on the facts alleged in their arbitration filings;[27] therefore, res judicata applies and the district court was correct to dismiss with prejudice.

## B

Now to the remaining fraud claims. In Louisiana, a contractual fraud claim involves three elements:

(1)     a misrepresentation, suppression, or omission of true information;

(2)     the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and

(3)     the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract.[28]

Without a false statement, there can be no misrepresentation. Here, Buyers allege that Sellers falsely claimed to be in compliance with all applicable laws and regulations when both Facilities were in violation of Chapter 68. So the first question is whether, assuming all of Buyers' allegations are true, Sellers actually did violate the regulation. Buyers falter at this first step.

---

have been pleaded, however, is precisely what is required by the federal law of res judicata.")).

[27] *See generally* Sellers' Mot. to Modify or Alternatively Partially Vacate Arbitration Awards, Ex. E, R. Doc. 18, USDC WDLA No. 6:19-cv-00833.

[28] *Koerner v. CMR Construction & Roofing, L.L.C.*, 910 F.3d 221, 228 (5th Cir. 2018) (formatting altered) (quoting *Shelton v. Standard/700 Associates*, 798 So.2d 60, 64 (La. 2001)).

No. 19-30995

1

With respect to Rosewood, Buyers allege that Sellers were in violation of Chapter 68 because a number of residents were not capable of understanding what their medications were or what they were for, meaning they were not eligible for "Self Administration" or "Assistance with Self-Administration." Despite this ineligibility, Buyers argue, Rosewood did not employ licensed RNs or LPNs to permit "Staff Administration of Medication."

But Buyers' interpretations of Chapter 68 are not entirely accurate, and we do not accept legal conclusions in a complaint as true.[29] To ascertain the correct understanding of Louisiana law, we first look to final decisions of the Louisiana Supreme Court.[30] But because there are none on this topic, we "must make an *Erie* guess and determine, in our best judgment, how [the Louisiana Supreme Court] would resolve the issue if presented with the same case."[31] As always, we begin with our alpha and omega: the enacted text.[32]

In relevant part, Chapter 68 states that:

> The ARCP shall record in the resident's [Person-Centered Service Plan] PCSP whether the resident can self-administer medication, needs assistance with self-administration . . . or requires staff administration of medication. . . .
>
> *Unless otherwise indicated in the PCSP*, residents *shall* have the option to self-administer their own medications. Residents who

---

[29] *See Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007).

[30] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007).

[31] *Id.*

[32] *See Thomas v. Reeves*, 961 F.3d 800, 810 (5th Cir. 2020) (en banc) (Willett, J., concurring) (quoting *United States v. Maturino*, 887 F.3d 716, 723 (5th Cir. 2018)).

are appropriate for this service will be aware of what the medication is, what it is for and the need for the medication. . . .

*Unless otherwise indicated in the PCSP*, residents *may* elect assistance with self-medication if it is a service offered by the ARCP. Residents who are appropriate for this service will be aware of what the medication is, what it is for and the need for the medication. . . .

The ARCP shall administer medications to ARCP residents *in accordance with their PCSP*. . . .

Medications shall be administered . . . by an individual who is currently licensed as an RN or LPN by the appropriate state agency.[33]

This text demonstrates that each residents' Person-Centered Service Plan—not the individual views of the ARCP's staff—determines what level of administration a resident shall receive. Therefore, a fair reading of the statute demonstrates that the only ways an ARCP can knowingly violate Chapter 68, in the context of Buyers' claims here, are if the ARCP: (1) fails to abide by a resident's PCSP;[34] (2) fraudulently fills out PCSPs;[35] or (3) knowingly permits staff administration of medication by an unqualified employee.[36] Buyers have failed to adequately plead any of these possible violations.

---

[33] LAC 48:6843(B)-(C) (emphasis added); *see also* LAC 48:6839 ("An ARCP shall ensure that services meet a resident's personal and health care needs as identified in the resident's PCSP.").

[34] *See* LAC 48:6839; LAC 48:6843(B), (C)(1), (2), and (3)(a).

[35] *Cf.* LAC 48:6835 (providing requirements for how to develop a resident's PCSP and explaining that PCSP's must reviewed at least every 90 days and on an ongoing basis to determine whether the PCSP is still appropriate).

[36] *See* LAC 48:6843(C)(3)(b).

*Failure to Abide by PCSPs*. Buyers do not plead any facts to suggest that Sellers did not abide by a resident's PCSP or suggest that any PCSPs classified anyone at a level other than being able to self-administer. And, the regulations state that "*unless otherwise indicated in the PCSP*, residents *shall* have the option to self-administer their own medications." So this cannot be the violation at the root of the fraud claim.

*Fraudulent PCSPs*. Buyers argue that the Amended Complaint adequately alleges that Nicol Hannie fraudulently filled out residents' PCSPs, knowingly misrepresenting their administration statuses. But the Amended Complaint tells a different story, particularly when viewed through the lens of Rule 9(b)'s heightened pleading requirement. The only paragraph that Buyers identify to support their argument reads, in its entirety:

> Further, Nicol Hannie was the individual in charge of preparing Person-Centered Service Plans ("PCSP") for each Rosewood resident while [Sellers] owned and operated Rosewood, prior to the closing of the transaction at issue. Chapter 68 defines a PCSP as "a written description of the functional capabilities of the resident, the resident's need for personal assistance and the services to be provided to meet the resident's needs." (Chapter 68 § 6803). Chapter 68 requires that ARCPs must update PCSPs at least quarterly (§6835(E)). Among the items assessed on a PCSP would be the resident's capacity for understanding what their medications are, what the medications are for and the need for the medication. (§6835 and 6843(B)).

Reading this paragraph, and the Amended Complaint as a whole, in the most Buyer-friendly light possible, Buyers have not alleged that Nicol Hannie fraudulently prepared residents' PCSPs. As noted, to state a fraud claim, Rule 9(b) requires a plaintiff to claim the "who, what, where, when,

and how of the alleged fraud."[37] Even assuming that the Amended Complaint alleges that Nicol knowingly misidentified residents' administration statuses (an assumption that requires stretching the imagination), the Amended Complaint lacks all details regarding the where, when, and how[38] of Nicol's allegedly fraudulent PCSP preparations. Pleading fraud requires particularity, and without this information, Rule 9(b) is not satisfied.

*Administration by an Unqualified Employee.* The third option for how Sellers could have violated Chapter 68—knowingly permitting staff administration of medication by an unqualified employee—has the strongest basis in the Amended Complaint, but not strong enough.

In one paragraph, Buyers allege that:

> [N]on-nursing Rosewood employees had stated to management that they were uncomfortable administering medications to Rosewood residents who did not meet the Chapter 68 standard for self-administration of medications. The Rosewood employees in question expressly raised their concerns to Nicol Hannie and his assistant during the relevant time period. Nicol Hannie and his assistant both told the

---

[37] *Thompson*, 125 F.3d at 903 (internal quotations omitted).

[38] Regarding the "how," it's worth noting that ARCPs do not work independently to develop PCSPs. For instance, when a resident first moves into an ARCP, the ARCP is required to assess the resident to determine his needs and preferences, and then the ARCP, "in conjunction with the resident or the resident's representative, if applicable, shall develop a PCSP using information from the assessment." LAC 48:6835(A), (B). And residents, or their representatives, must sign off on the PCSP. LAC 48:6835(E). ARCPs have no authority to classify a resident for staff administration; "[t]he determination of the need for staff administration of medication *will be made by resident's physician* after assessment of the resident, and after consultation with the resident, resident's legal representative if applicable, and the ARCP staff." LAC 48:6843(B) (emphasis added). Based on these regulations, which go unmentioned by Buyers, it's entirely unclear how Nicol could have fraudulently prepared PCSPs to misrepresent residents' administration statuses.

employees that their employment would be terminated if they did not administer the medications as instructed, including to residents for whom self-administration or assistance with self-administration of medications was inappropriate under Chapter 68.

Distilled down to its most important elements, this allegation, if accepted as true, reflects that employees told Nicol Hannie they did not feel comfortable administering medications to residents, and Nicol Hannie told the employees to "administer the medications as instructed."

Even assuming that the phrase "administer(ing) medication"—which has multiple meanings—here means "staff administration of medication," as opposed to overseeing or assisting residents in self-administration, this allegation, likewise, does not hurdle Rule 9(b)'s high bar. Buyers are required to either show Sellers' motive to commit fraud or to identify circumstances that indicate Sellers' conscious behavior, and "the strength of the circumstantial allegations must be correspondingly greater."[39] This allegation falls into the latter category—a circumstance indicating Sellers' conscious behavior. But the Amended Complaint only alleges that employees expressed a discomfort and Nicol Hannie told employees to administer medications "as instructed." The pleadings are devoid of allegations regarding what instructions the employees received, who gave the instructions, whether anyone followed the instructions, and whether Sellers were aware of the specific instructions given. Because Buyers do not provide this information, we would have to make guesses to fill in the

---

[39] *Tuchman*, 14 F.3d 1068.

No. 19-30995

blanks, but "Rule 9(b) does not allow the plaintiffs to force the defendants—or the court—to make such assumptions."[40]

Buyers have not adequately pleaded a misrepresentation with respect to Rosewood. And without a misrepresentation, there can be no fraud.

2

As was the case with Rosewood, the first questions regarding the sale of Cedar Creek is whether, assuming all of Buyers' allegations are true, Sellers actually did violate Chapter 68. As was the case with Rosewood, Buyers have not alleged the possibility of any violation.

Unlike Rosewood, Cedar Creek did provide "Staff Administration of Medication" as one of its stated services, so everyone agrees that Cedar Creek was required to have some level of professional nursing staff. But the parties disagree on the number and type of nursing staff required. Buyers allege that Sellers were in violation of Chapter 68 because it did not have an RN on staff to supervise the LPNs. The Louisiana Supreme Court has not addressed this question, so we must do our best to stand in the Court's shoes.[41]

---

[40] *Dorsey v. Portfolio Equitis, Inc.*, 540 F.3d 333, 340 (5th Cir. 2008); *see also United States ex rel. Integra Med Analytics, L.L.C. V. Baylor Scott & White Health*, 2020 WL 2787652, at *5 (5th Cir. May 28, 2020) (finding allegations that corporation gave employee instructions to behave unethically insufficient to state a fraud claim because the allegations failed to state the exact content of the directives). And even if we could make an assumption, the logical assumption would not be in Buyers' favor. As noted, the regulations instruct employees to abide by the requirements set forth in the PCSPs, and Buyers have not alleged that anyone did or was instructed to violate a PCSP. So the only logical inference is that "as instructed" means "as indicate in the resident's PCSP," which would not be a violation of—and in fact would be affirmative of and compliant with—Chapter 68.

[41] *In re Katrina*, 495 F.3d at 206.

Buyers point us to LAC 48:6865(B)(1), which reads:

> In ARCPs that offer staff medication administration . . . the ARCP shall provide a sufficient number of RNs and LPNs to provide services to all residents in accordance with each resident's PCSP 24 hours per day.

Buyers argue that the "conjunctive 'and' shows that ARCPs that offer staff administration of medication do not have the option of employing LPNs only."

This argument is befuddling. First, the ordinary, everyday meaning of the phrase "shall provide a sufficient number of RNs and LPNs" is that ARCPs should have a sufficient number of RNs and a sufficient number of LPNs, whatever the ARCPs determine those numbers to be, to satisfy their residents' needs. The provision does not, by its plain terms, require an ARCP to have at least one RN and at least one LPN, and "[t]he principle that a matter not covered is not covered is so obvious that it seems absurd to recite it."[42] By Buyers' logic, an ARCP would be prohibited from employing RNs only, and would be required to hire LPNs, even though RNs' licenses are more permissive than LPNs'.

The futility of Buyers' argument is further highlighted by the text of LAC 48:6843(C)(3)(b), which provides that:

> Medications shall be administered . . . by an individual who is currently licensed as an RN or an LPN by the appropriate state agency.

Despite Buyers' suggestion otherwise, nothing in this provision requires an LPN to be under the supervision of a licensed RN at a facility like

---

[42] Antonin Scalia & Bryan Garner, Reading Law 93 (2012).

No. 19-30995

Cedar Creek. Tellingly, the regulations only provide one instance where an LPN's administration of medicine is required to be "under the supervision of a licensed RN, physician, or advanced practice nurse."[43] This requirement only exists at level 4 facilities (which Cedar Creek is not) where intravenous therapy is being provided (which Cedar Creek does not).[44] The fact that the regulations specifically note the requirement of RN supervision in one circumstance, but not in the circumstances relevant to Cedar Creek, further demonstrates that these regulations impose no such requirement on Cedar Creek.[45]

Buyers' allegations that a Cedar Creek employee told Joyce and Mo Hannie that they needed to hire an RN are of no moment. Those allegations demonstrate only that *an employee* believed the regulations required hiring an RN; they do not reflect what the law actually did require. And because Chapter 68 did not in fact require Sellers to employ an RN at Cedar Creek to oversee its LPNs, Sellers could not have misrepresented Cedar Creek's compliance, and Buyers have not pleaded a cognizable fraud claim.[46]

---

[43] LAC 48:6843(C)(3)(c).

[44] *Id.*

[45] *See* Scalia & Garner, Reading Law at 124 ("Where the legislature has specifically used a word or term in certain places within a statute and excluded it in another place, the court should not read that term into the section from which it was excluded.").

[46] Buyers also contend that Sellers were noncompliant because Sellers "had not employed the required activities personnel or had required equipment." However, Buyers' single-sentence, non-specific allegation is too conclusory to satisfy any pleading standard, let alone Rule 9(b). Buyers gave this argument similar short shrift in their opening brief, effectively abandoning the claim on appeal. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

19

No. 19-30995

## C

Under Louisiana law, and in relevant part to this dispute, shareholders can be held personally liable for the debts of a company "where fraud or deceit has been practiced by the shareholder acting through the corporation."[47] But, as we just explained, because there was no misrepresentation, there was no fraud. And if there was no fraud, there's no claim against the Hannies as individuals. The district court, therefore, was correct to dismiss the claims against Nicol, Mo, and Joyce Hannie.

## IV

Buyers' non-fraud claims were subject to arbitration, and though their fraud claims may have survived under a lower standard, Rule 9(b) requires particularity to protect the time and resources of both courts and litigants. Since Buyers have failed to satisfy Rule 9(b)'s heightened pleading standard, the judgment of the district court is AFFIRMED.

---

[47] *Riggins v. Dixie Shoring Co., Inc.*, 590 So. 2d 1164, 1168 (La. 1991).